SMITH et al., Respondents, v. THE JEFFERSON BANK, Appellant.

St. Louis Court of Appeals, October 30, 1906.

1. **SALES: Conversion: Draft Secured by Bill of Lading.** Two car loads of goods were shipped and consigned to the factor of the shipper; a commission company of which the factor was president obtained possession of the bills of lading, reshipped the goods and consigned them to a third party in another city, drawing drafts on the last consignee secured by the bills of lading, sold the drafts to a bank, and sent its own checks to the shipper in payment for the merchandise, then immediately became insolvent so the shipper never collected such checks. *Held*, if the bank bought the drafts secured on the merchandise with the knowledge that the commission company drawing them did not own the merchandise, was insolvent and intended to appropriate the proceeds, it was a party to the conversion and liable to the shipper for the value of the goods.

2. ———: ———: ———. In an action for conversion in such case, the evidence is examined and held there was no substantial evidence to show the bank had such notice of the true ownership or the insolvency of the commission company as would put it upon its inquiry, and no evidence to show there was a fraudulent design between the bank and the commission

company to appropriate the goods, and no evidence to show that the drafts were not purchased but merely taken for collection or to secure an antecedent debt, and those issues were erroneously submitted to the jury.

3. **AGENCY: Delegation of Authority.** A factor occupies a quasi fiduciary relation to his principal who has reposed confidence in his skill and discretion and he can not delegate his authority unless the principal expressly or by conduct empowers him to do so.

4. ——: ——: **Course of Dealing.** Where plaintiff consigned goods to his factor and a company with which the factor was connected took possession of the goods and reconsigned them, in an action for conversion against a bank to whom the bills of lading were transferred by the company, the evidence is examined and held a question for the jury, to find from the circumstances, whether the plaintiff by his conduct and course of dealing had conferred upon his factor the power to delegate the authority so as to make the sale of the goods valid.

5. ——: ——: **Ratification: Knowledge of Principal.** A principal can not ratify the unauthorized act of one who assumes to act as his agent in ignorance of the fact of such assumed authority.

6. ——: ——: ——: **Relating Back.** Ratification of an assumed agent's act relates back to the unauthorized act and is equivalent to previous authority and binds the principal to third persons as well as the agent the same as though the agent had acted by authority.

7. ——: ——: ——. Merchandise was shipped to a factor to dispose of and a company with which the factor was connected took possession of the goods and reconsigned them, sending its own checks to the shipper in payment. A letter accompanied these checks, stating the circumstances of reshipment. The shipper accepted the checks, but did not collect them on account of the insolvency of the company. In an action for conversion of the goods the evidence showed the shipper was ignorant of such insolvency and there was evidence tending to show that he thought his factor and not the company had reshipped the goods, the question as to whether there was a ratification of the unauthorized sale of the merchandise was a question of fact for the jury.

8. **PRACTICE: Evidence: Prejudical Error.** In an action for conversion, telegrams between third persons who had to do with the transaction out of which the case arose, although irrelevant were not prejudicial where the statements contained in them were testified to by witnesses and where they contained nothing which could be construed as self-serving declarations.

9. ———: ———. But under the facts, as examined in this case, certain correspondence between the plaintiff and his agents in connection with the transaction out of which the action arose, was hearsay, irrelevant and prejudicial.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*Block & Sullivan* for appellant.

(1) The court erred in permitting respondents to introduce secondary evidence of the contents of letters. Price v. Hunt, 59 Mo. 262; Kuhn v. Schwartz, 33 App. 614; Cozens v. Barrett, 23 Mo. 546: (2) Self-serving declarations, hearsay, and impressions not competent as testimony. Spier v. Burlingame, 61 Mo. App. 87; Cottrill v. Speiss, 23 Mo. App. 41; Tucker v. Frederick, 28 Mo. 575; Collins v. Todd, 17 Mo. 540; Fountain v. Ry., 114 Mo. App. 682, 684; Redmon v. Piersol, 39 Mo. App. 174. (3) The admission of irrelevant and incompetent testimony is reversible error. Gunther v. Roy, 74 Mo. App. 601. (4) Agency is provable by course of dealing Cumming v. Hurd, 49 Mo. App. 145; Sharp v. Knox, 48 Mo. App. 176. (5) Respondents elected to look to the produce company and ratified its act. Tower v. Imp. Co., 192 Mo. 395; Hackett v. Van Frank, 105 Mo. App. 399; Adv. Co. v. Wannamaker, 115 Mo. App. 280; Valentine v. Decker, 43 Mo. 585; Stoller v. Coates, 88 Mo. 523; Nansen v. Jacobs, 93 Mo. 345; Boogher v. Frazier, 99 Mo. 331; Dry Goods Co. v. Warden, 151 Mo. 583; Tiernan v. Bldg. Assn., 152 Mo. 144; Nalle v. Parks, 173 Mo. 627; Smoot v. Judd, 184 Mo. 517; Ames v. Tucker, 8 Mo. App. 98; Schepflin v. Dersar, 20 Mo. App. 573; Sessions v. Block, 40 Mo. App. 571; Sanders v. Peck, 87 Fed. 61; Lapp v. Ryan, 23 Mo. App. 439; Cushman v. Loker, 2 Mass. 106; Connihan v. Thompson, 111 Mass.

272; Fowler v. Bank, 113 N. Y. 450; Terry v. Munger, 121 N. Y. 167; Glor v. Kelley, 63 N. Y. Supp. 339; Frank v. Jenkins, 22 Ohio St. 603; Leavitt v. Fairbanks, 92 Me. 523; Clark & Skyles Agency, p. 266, sec. 106. (6) A factor may be dealt with as owner. Crocker v. Irons, 3 Mo. App. 486. (7) Instructions submitting propositions of which there is no evidence are erroneous. Danker v. Goodwin Mfg. Co., 102 Mo. App. 729; Houck v. Railway, 116 Mo. App. 559; Sallee v. McMurray, 113 Mo. App. 269; Grier v. Strother, 111 Mo. App. 392. (8) Taking commercial paper in payment of prior debt is holding for value. Dymock v. Bank, 67 Mo. App. 103. (9) Instructions authorizing a verdict must not ignore any testimony which is believed would produce a different result. Stewart v. Emerson, 70 Mo. App. 486. (10) Respondents could not declare in trover and recover in assumpsit. Duncan's Admr. v. Fischer, 18 Mo. 403; Ensworth v. Barton, 60 Mo. 514. (11) An indorsee for collection is a holder for value if he parts with value on faith of the transfer. Bank v. Ball, 60 Mo. App. 588; Ames v. Bank, 79 Mo. 421. (12) An indorsee for value of a draft is a holder for value of the property represented by a bill of lading accompanying the paper. Dymock v. Bank, 67 Mo. App. 104. (13) Contradictory instructions constitute reversible error. Grier v. Strother, 111 Mo. App. 392; Bluedon v. Railroad, 108 Mo. 450.

*P. C. Young* for respondents.

(1) A factor cannot pledge goods of his principal for his own liabilities, and is bound to obey the orders of his consignor as to terms of sale. Singer Mfg. Co. v. Hudson, 4 Mo. App. 145. (2) The title of a principal to his goods is not divested by his factor's transfer of them to pay a private debt. Benny v. Rhodes, 18 Mo. 147; 43 Mo. 86; 65 Mo. 89; 71 Mo. App. 186; Croker v. Irons, 3 Mo. App. 486. (3) "Where goods are con-

Smith v. Bank.

signed to a factor for sale they remain the property of the consignor, and are not subject to the debt of the factor and no ingenious contract is required to protect him from his creditors." Peek v. Heim, 14 A. S. R. 866; Johnson v. Martin, 94 A. S. R. 706; Shaw v. Bank, 101 U. S. 564, 25 S. 892; Keighler v. Savage Mfg. Co. (Md.), 71 A. M. D. 606; Decan v. Shipper (Penn.), 78 Am. Dec. 335; McCreary v. Gaines, 40 Am. R. 818; Bott v. McCoy, 59 D. 224. (4) When an agent exceeds his authority in selling the goods of his principal, as where he sells them in payment of his own debts, or exchanges them for other goods instead of selling them, a bona fide purchaser acquires no title as against the principal." Gray v. Agnew, 95 Ill. 315; Rodick v. Coburn, 68 Me. 170; Parsons v. Webb, 8 Me. 38. (5) A sale by a factor to his creditor for an antecedent debt passes no title. Warner v. Martin, 11 How. 223; 13 L. 667; Bank v. Gillispee, 137 U. S. 411; 34 L. 727. (6) Goods in the hands of factor remain the property of the principal. Benny v. Pegram, 18 Mo. 191. (7) The purchaser of the bill of lading with a reason to believe his vendor was not the owner or that it was held to secure a debt is not a bona fide purchaser. One who has reason to believe a fact exists, knows it exists. Ross v. McCoy, 56 D. 224; Romeo v. Martucci, 77 A. S. R. 327; McLaughlin v. Brett, 105 N. Y. 391; Tiedeman on Sales, sec. 317; Hoss v. Damon, 9 Iowa 589; Trudo v. Anderson, 10 Mich. 357; Moore v. Robinson, 62 Ala. 557; Dows v. Perrin, 16 N. Y. 462, 333; Sollus v. Everett, 20 Wend. (N. Y.) 575.

STATEMENT.—This is an action for damages for the alleged conversion by defendant of two carloads of eggs belonging to plaintiffs. Plaintiffs were partners doing business in the city of Fredonia, Kansas, under the name of the Fredonia Produce Company. Defendant is a banking institution in the city of St. Louis. The carloads of eggs in question were shipped by plaintiffs from

Fredonia on the 12th and 14th days of July, 1904, and consigned to B. W. Redfearn in St. Louis. The terms of the shipments are shown by two ordinary bills of lading in which plaintiffs are designated as consignors and Redfearn as consignee. Invoices were sent to Redfearn along with the bills of lading, notifying him of the shipments and that the terms were cash on delivery. The bills of lading are not contained in the record, but, as we understand, they were issued by the St. Louis & San Francisco Railroad Company, which company took charge of the cars at Fredonia, hauled them to St. Louis and there delivered them to the American Refrigerator Transit Company at its cooling establishment on Gratiot street about the 17th or 18th of July, and the Refrigerator Company, the petition alleges, delivered the eggs on the same day to the Mound City Produce Company without a surrender of the bills of lading or without permission from or ratification by the plaintiffs, or the consignee, Redfearn. The Mound City Produce Company was a corporation engaged in handling poultry, eggs and other country produce, both on commission and by purchases and sales on its own account. Its place of business was in the city of St. Louis. Redfearn was its president and seems to have been in entire control of it. The other employees were C. L. Gunn, W. P. Johnson and H. H. Johnston, the latter being the secretary. What happened to the two carloads of eggs on their arrival in St. Louis was this: On July 18th, the day of their arrival, H. H. Johnston, secretary of the Mound City Company, reconsigned the eggs to James Rowland & Co., a firm of produce dealers in New York, taking bills of lading from the Wabash Railroad Company at St. Louis for the eggs in the name of the Mound City Produce Company as consignor, and James Rowland & Company, as consignee. On the same day Johnston drew two drafts on Rowland & Company for the price of the eggs, one for $1,300 and

one for $1,175. These drafts were drawn payable to the order of the Jefferson Bank and in the name of the Mound City Produce Company as drawer. The drafts, with the bills of lading issued by the Wabash Railroad Company attached, were deposited in the bank, the proceeds going to the credit of the Mound City Produce Company on the books of that institution. At the same time Johnston drew two drafts in the name of the Mound City Produce Company for similar amounts in favor of plaintiffs as payees and on the Mound City Produce Company itself; that is to say, the Produce Company was both the drawer and the drawee. These drafts were remitted to plaintiffs on that day and on receipt were deposited by them to their credit in the State Bank of Fredonia, and by the latter institution sent to its correspondent in St. Louis for collection. They never were paid because the Mound City Produce Company failed before the presentment. Accompanying the drafts was this letter:

"St. Louis, Mo., July 18, 1904.
"Fredonia Produce Company,
     "Fredonia, Kansas.
"Gentlemen: Enclosed we hand you one draft for $1,175, covering the amount drawn on Messrs. James Rowland & Co., against your 275 cases out of Fredonia, July 12th in A. R. L. No. 4780, and the other for $1,300, covering the amount drawn against them on your 306 cases out of Fredonia, July 14th, A. R. L. No. 5801. We were unable to dispose of these eggs here at what we considered a satisfactory price, and therefore forwarded them to New York.
     "Yours respectfully,
     "MOUND CITY PRODUCE COMPANY."

As to whether the foregoing acts of Johnston, the secretary of the Mound City Company, were directly authorized by Redfearn, the evidence is contradictory. Johnston testified that they were specifically authorized,

while Redfearn's testimony goes to show he was absent from the office of the Mound City Company when they occurred. As to whether said company obtained the eggs from the American Refrigerator Company on presentment of the original bills of lading issued to plaintiffs, or without those bills, is not clear. Johnston testified that the Mound City Company could frequently obtain cars of eggs shipped from plaintiffs at Fredonia without the bills of lading, saying the bills of lading were "open," whatever that may mean, and not required to be presented to the railroad company as a condition on which the property would be surrendered. After the eggs had been shipped to Rowland & Company at New York, and drafts drawn on that concern for the price, and before the eggs or drafts reached New York, it becoming apparent to Gunn, another employee of the Mound City Company that that corporation was in a failing condition, he telegraphed to Rowland & Company, in the name of the Fredonia Produce Company, to remit for the eggs direct to plaintiffs. He says the reason he did this was that he found out that the defendant bank was endeavoring to have the eggs diverted from the original consignee, and knowing they belonged to plaintiffs, he felt it was his duty to get the proceeds into the hands of the right parties. In conformity to this notice, Rowland & Company refused to pay the drafts drawn on them by the Mound City Company for the eggs and notified plaintiffs by telegram that if the eggs came into their hands they would hold the proceeds safe. This telegram was dated July 21st. On the 23d of that month Rowland & Company notified plaintiffs by wire that they (Rowland & Company) would not get the eggs as the defendant bank had control of them. The fact in this connection is that when the Jefferson Bank learned by wire that Rowland & Company had refused payment of the drafts drawn by the Mound City Company and which the Jefferson Bank

held with the bills of lading attached, said bank gave notice to the Hanover National Bank of New York that it was the holder of the two drafts with bills of lading attached, and that if Rowland & Company would not pay the drafts, to have the eggs turned over to some reliable commission firm to sell for the defendant, it guaranteeing to hold the seller harmless against all claims. This telegram was concurred in by the Mound City Company by a postscript signed by Redfearn himself; though Redfearn denies knowing at the time he signed the postscript that the message referred to the particular eggs belonging to plaintiffs. The eggs were afterwards sold by Saxton & Company, another firm in New York, and defendant received the proceeds. Plaintiffs subsequently instituted this action for the conversion of the property by the defendant bank and the American Refrigerator Company, alleging that the two defendants had conspired together to divert the eggs from Redfearn to the defendant bank, the property having been disposed of for the bank's benefit; that the action of the Mound City Company in getting possession of the eggs in St. Louis, reshipping them and drawing drafts on the consignee in its own favor, and negotiating the drafts, with the bills of lading attached, to the bank, was done without authority from the plaintiffs or their agent Redfearn; further, that the drafts were deposited with the defendant bank to the credit of the Mound City Company, either as security for or payment of a pre-existing debt which it owed the bank. It was further charged that the two defendants knew the Mound City Company was a commission firm with no power over property other than to sell and remit to its principals, and also knew the eggs were the property of the plaintiffs and that the Mound City Company had no authority, right or permission from plaintiffs to take or receive the eggs from the Refrigerator Company and that the latter had no right, permission or consent

to deliver the eggs to the former company; that the Jefferson Bank at no time paid out anything on the drafts drawn on Rowland & Company, but diverted the eggs in transit and appropriated the proceeds in liquidation of the debt owed by the Mound City Company; that plaintiffs never ratified any act by which the eggs were diverted to the Mound City Company, or any of the acts and doings of said company and the two defendants in reference to said property. Subsequently a nonsuit was taken as to the American Refrigerator Transit Company and, the Bank, being left as sole defendant, filed an answer which was in effect, first, a general denial; second, that both the Mound City Company and Redfearn were authorized by the plaintiffs to handle produce shipped by plaintiffs to St. Louis, either by selling the same in said city or reconsigning it elsewhere and in case it was reconsigned, were authorized to draw against the same with bills of lading attached to drafts and sell and dispose of the drafts; that the Mound City Company had reconsigned the eggs sued for, drawn drafts with bills of lading attached and discounted the drafts to defendant who had paid that company the proceeds; third, that the proceeds of the drafts were used by the Mound City Company to pay certain indebtedness it owed plaintiffs, so that the latter actually received the proceeds of the discount; fourth, that after having sold the defendant the drafts with bills of lading attached, the Mound City Company informed plaintiffs of what had been done and sent them its drafts for the amount received in disposing of the eggs; that plaintiffs accepted said drafts and sold and disposed of them with full knowledge of what had been done with their eggs, thereby ratifying the acts of the Mound City Company; fifth, that for a long period plaintiffs had been consigning produce to Redfearn which was either sold in St. Louis by the Mound City Company or reconsigned, but in all cases remittances

were made in the name of the Mound City Company; that plaintiffs knew the Mound City Company had been doing this and thereby conferred authority on the Mound City Company. A replication was filed putting the affirmative averments of the answer in issue, alleging that the Mound City Company was insolvent when it discounted the drafts on Rowland & Company, and averring that when plaintiffs received the drafts sent by said company, they supposed it had bought the eggs from plaintiffs' agent Redfearn, or that he had sold them to some one else and was using the Mound City Company's paper to make remittance. The reply especially denied that a course of dealing existed between said company and Redfearn and plaintiffs in relation to plaintiffs' goods, by which said goods were consigned to Redfearn but handled by said company without delivering bills of lading, or that said company sold the goods and paid for them by its own checks; further denying that plaintiffs ever had ratified such a course of proceedings.

More facts need to be stated to make this controversy clear. B. W. Redfearn had formerly been associated with plaintiffs in business and was their intimate friend and confidant. He was expecting to engage in business with them again as soon as he could raise the money to buy an interest. The testimony goes to show that plaintiffs had made a verbal arrangement with him by which he agreed to handle plaintiffs' produce when shipped to St. Louis, by selling it when he could, without charging a commission; or, if there was no market in St. Louis reconsigning it to other dealers in the east. Under this arrangement, plaintiffs had been shipping produce to St. Louis for about a year, the cars averaging from one to four a week. In every instance which was brought out in the evidence, it turned out that the plaintiffs' produce was either sold in St. Louis by the Mound City Company and the proceeds remitted to plaintiffs at Fredonia, or that the

Mound City Company had reconsigned the goods to an eastern dealer in exactly the same way the goods in question were handled. The said company would rebill the goods to an eastern dealer and draw a draft on such dealer for their value, attach the bill of lading to the draft, negotiate the draft to the defendant bank and thereby get the proceeds put to its credit in the bank. It would then pay plaintiffs by a draft drawn on itself, which would be sent to plaintiffs, deposited by them in their bank at Fredonia, transmitted by said bank to its correspondent in St. Louis and on presentment the Mound City Company would pay it. That was the mode followed in this case and in the great majority of transactions which occurred; though one of the plaintiffs swore Redfearn sometimes sent the draft of the Mound City Company in a letter signed by himself. It was conceded that in every instance in which the documents could be produced, the correspondence was in the name of the Mound City Company. It further appeared that said company was in straightened circumstances and was maintaining itself by a process known as "kiting" drafts on the plaintiffs; that is to say, when it needed funds it would draw on plaintiffs, discount the exchange at the defendant bank and, as plaintiffs did not owe said company anything, in order to meet these drafts when they were presented to plaintiffs for payment, it would send plaintiffs drafts drawn on itself for a like amount. There is no proof that the latter drafts went through the defendant bank. Plaintiffs would honor the drafts drawn by the Mound City Company on them and then would cash the drafts which the Mound City Company sent on itself to cover those accommodation drafts, at the Fredonia Bank and they would be taken up on presentment by the Mound City Company in St. Louis. In this manner plaintiffs aided the Mound City Company to get the use for a few days of the money it would receive from the defendant bank on the drafts

drawn on plaintiffs. The proceeds of those drafts would be placed to the Mound City Company's credit on defendant's books and could be checked against to meet urgent demands, during the time that would elapse before the drafts drawn on itself to reimburse plaintiffs would be returned to St. Louis for payment. But this course of business came to an end at the very time the transaction in controversy was on hand. The cause of the failure of the Mound City Company was that just prior to July 18th, it drew some $5,500 of these kiting drafts on plaintiffs and deposited the proceeds of them with the Jefferson Bank, but plaintiffs refused to honor them. That refusal forced the Mound City Company into insolvency. On July 18th the Mound City Company had drawn drafts on different customers to the amount of about twelve thousand dollars and had asked that the drafts be discounted by the defendant bank and the proceeds placed to the Mound City Company's credit. In view of the large amount of the drafts, one of defendant's cashiers called on Johnston, the secretary of the Mound City Company, to know what deposit would be made that day to cover the drafts. Johnston showed between ten and eleven thousand dollars of exchange held by the Mound City Company with bills of lading attached, which would be put to its credit in the bank. This exchange consisted of substantial securities and among them were the drafts on Rowland & Company secured by bills of lading for the eggs in controversy. This would leave an indebtedness to the bank on the day of said transactions of some hundreds of dollars, a shortage that was covered by a demand note. The foregoing are, we believe, the material facts of the controversy.

The admission of certain testimony is assigned for error. First, that secondary evidence of the contents of certain letters written by the Mound City Company to plaintiffs was admitted, though plaintiffs had refused

to produce those letters in obedience to a notice to do so and made no proof they were lost or destroyed.

Second. The admission of the telegram sent by Gunn in plaintiff's name to Rowland & Company, said telegram being as follows:

"7—19—1904.

"Jas. Rowland & Company,
    "84-86 Judson St.,
        "New York.

"Two hundred, seventy-five and three hundred six cases lots belong to us. Refuse Mound City Produce Company drafts and remit to us direct.

"FREDONIA PRODUCE CO."

Third. Rowland & Company's telegram to plaintiffs, which is as follows:

"Dated New York—21.

"To Fredonia Produce Company,
    "Fredonia, Kansas.

"Mound City drafts were refused by us yesterday and returned. If eggs come in our hands will hold proceeds. "JAS. ROWLAND & CO."

Fourth. Redfearn's telegram to plaintiffs:

"Dated W. St. Louis, Mo., 7—23—1904.

"To Fredonia Produce Company,
    "Fredonia, Kansas.

"Have wired Rowland twice they were yours. Think when fully understood will be released.

"B. W. REDFEARN."

Fifth. Telegram by plaintiffs to Rowland & Company:

"July 24, 1904.

"James Rowland & Co.,
    "New York, N. Y.

"Two hundred, seventy-five and three hundred, six cases eggs belonging to us. If necessary to protect our interest attach eggs or proceeds handling best advantage

on account. We will protect you. Think Hanover Bank acting for St. Louis Bank confirm action by wire to Fredonia.                "FREDONIA PRODUCE CO."

Sixth. Telegram by plaintiffs to Jefferson Bank:

"Fredonia, 7—23.

"Jefferson Bank: Mound City Produce Company had no authority over our eggs. We hold you responsible unless you deliver to-day 581 cases, now in New York, to James Rowland & Company. Answer.

"FREDONIA PRODUCE COMPANY."

Seventh. Letter written by Gunn to plaintiffs:

"St. Louis, Mo., July 19, 1904.

"Fredonia Produce Co.,
    "Fredonia, Kansas.

"Friend Smith: Kindly note copy of wire I sent Rowland over your signature. Remember you are in the hands of friends. Keep your stock coming to B. W. R. as usual. They cannot touch any of it.

"I sent 29 brls. to H. L. Brown & Son as per enclosed bill lading. Also sold the 116 cases at 15c here and will send you the money as soon as the party pays me which will be to-morrow or next day. Will have check made payable to you.

"Redfearn's train was late and your two lots of eggs were used before he knew of it.

"See copy of letter so guess there will be no trouble. Keep these papers for future reference. Will come out all O. K. I think. Redfearn seems to think the bank is going to swing us. At least that is the way it looks now.                "Yours hurriedly,
                        "CLAUDE."

Under the instructions of the court the jury returned a verdict in plaintiff's favor and defendant appealed.

GOODE, J. (after stating the facts).—1. A matter left somewhat obscure by the evidence is how the Mound City Company got the eggs from the railway company without the original bills of lading, if, in point of fact, this happened. There is testimony that such an incident was not unusual, and as the parties have laid no stress on it, we will lay none.

Several instructions given for the plaintiffs proceeded on the theory that the evidence afforded a basis for a finding that the eggs were turned over by the Mound City Company to the defendant bank to pay or secure an antecedent debt owed to that institution. Other instructions submitted the issue of whether the bank took the drafts on Rowland & Company with the bills of lading attached, not as an innocent purchaser for value without notice of the ownership of plaintiffs, but merely for collection. An attentive perusal of the record has not disclosed any substantial evidence tending to establish either of those hypotheses. When the drafts were negotiated to the bank on July 18th, the Mound City Company was not indebted to that institution but had a considerable balance to its credit. It is true that the checks drawn by the company on that day against its account, left an overdraft at the close of business which was settled by note; but this indebtedness accrued after the negotiation of the bills of lading. What the testimony shows without conflict is that on July 18th, the Mound City Company wanted to draw on the bank, or obtain cashier's checks from it, to meet outstanding liabilities amounting to about $12,000, and so notified the bank's officers. On account of this request for credit, the bank inquired what deposit would be made that day by the Mound City Company to cover the cashier's checks requested by it, and Johnston, the secretary of the company, showed between ten and eleven thousand dollars of bills receivable, mostly secured by bills of lading and including the two drafts on

Rowland & Company for the eggs in controversy, which were to be deposited. The deposit was made and the bank extended the credit and issued to the Mound City Company its cashier's checks, which were used by the company in meeting its current liabilities. It is certain that the bank bought the Rowland & Company drafts on the faith of the bills of lading and placed the proceeds to the credit of the Mound City Company, as it had done in many previous instances. The only question in the case is whether there were any circumstances which gave notice to the bank of the possible insolvency of the Mound City Produce Company, or that the eggs were not its property. If the bank had bought the drafts secured on the eggs, with knowledge that the Mound City Company did not own the eggs, was insolvent and was going to appropriate the money received instead of turning it over to plaintiffs, the latter might follow the eggs, or what the bank got for them, into its hands. Such a transaction would have amounted to a conversion of the property by the Mound City Company, to which the bank would have been a party; and this is the more true because the eggs had been consigned to Redfearn to be sold for cash on delivery. [Warner v. Martin, 11 How. (U. S.) 209; Miller v. Schneider, 19 La. Ann. 300; 92 Am. Dec. 535; Benny v. Rhodes, 18 Mo. 147; 59 Am. Dec. 293; Benny v. Pegram, 18 Mo. 191; 59 Am. Dec. 298; Hoffman v. Kramer, 123 N. C. 566; Girard v. Taggart, 5 Serg. & R. 19; 9 Am. Dec. 327; 2 Clark & Skyles, Agency, sec. 882.] But what circumstances were there to suggest to the bank that the Mound City Company did not own the eggs, or was in failing circumstances? The company handled its own as well as consigned produce; and it has been expressly decided that in such a case a purchaser from a factor is not put on inquiry as to the title of the particular goods. [Crocker v. Jones, 3 Mo. App. 486.] We find no suspicious circumstance to put the bank on in-

quiry. It allowed the company to overdraw its account the very day it bought the Rowland drafts; which argues strongly that the bank believed it was solvent and acting in good faith. The cause of the failure was that plaintiffs refused to honor accommodation drafts to the amount of $5,500, which the Mound City Company had drawn on them; but the evidence is that the bank knew nothing of this refusal until the 19th, and had no reason to anticipate such an event, even if it knew, or had reason to believe the drafts were for accommodation; as to which there is but little, if any, evidence. Through a period of a year or more very many drafts drawn by the Mound City Company on plaintiffs and discounted by defendant, some of them for more than $1,500, had been honored by plaintiffs. The testimony is that the first intimation defendant's officers had of disaster to the Mound City Company, was on the 19th, when they were notified that these drafts had been dishonored; and there was no circumstance to impeach this testimony. In truth, nearly $6,700 of the cashier's checks issued by defendant on July 18th to the Mound City Company, were used by said company to take up accommodation paper drawn on plaintiffs, much, or all, of which they had honored. The theory that the bank permitted the company to overdraw on the 18th, knowing it was insolvent and in order to maintain its credit until the $5,500 of accommodation drafts were paid, is a surmise unsupported by any evidence. We find no testimony going to establish the allegation of the petition that plaintiffs' eggs were appropriated by the defendant bank pursuant to a fraudulent scheme between defendant and the Mound City Company or Johnston, its secretary. While it is the law that slight circumstances will uphold the inference of fraud, it is also the law that fraud must be proved and cannot be presumed in legal actions, and that the burden of proof is on the party alleging fraud. [Funkhouser v. Lay, 78 Mo. 458;

Garesche v. McDonald, 103 Mo. 1, 15 S. W. 379; Hardwicke v. Hamilton, 121 Mo. 465, 26 S. W. 342.]

The only fact we are pointed to by plaintiffs' counsel as indicating that the drafts on Rowland & Company for the eggs in controversy were taken by the bank for collection and not purchased, is the testimony of Johnston that, if a draft came from Fredonia or Kansas City payable to the Mound City Company, it would turn the same over to defendant and if defendant could not collect it, the Mound City Company would get no final credit for it; that the bank would give credit when the draft was deposited and if it proved uncollectible, would call on the Mound City Company for reimbursement; or, in other words, would charge the item back to the Mound City Company. That testimony had no reference to drafts drawn by the Mound City Company itself against the product consigned by it to eastern dealers, and negotiated to the bank with bills of lading attached. None of the evidence tends to contradict the positive testimony of the bank's officers, of Johnston and of Redfearn himself, that the drafts drawn on Rowland & Company for the eggs in controversy were actually sold to the bank on the 18th, and the proceeds deposited to the Mound City Company's credit and paid out on that day in the form of cashier's checks which were used by the company in settlement of its obligations to others. The submission of issues relating to defendant's having taken the Rowland drafts to pay or secure a debt owing to it by the Mound City Company or for collection, was harmful error.

2. Treating the transaction as one of good faith between the bank and the Mound City Company, and the discount by the bank of the Rowland & Company drafts as a bona fide sale and not a pledge to secure an antecedent debt or a transfer for collection, the question arises whether the bank acquired title to the eggs

in the transaction. The bills of lading were prima facie negotiable and carried the title to the property covered by them. [R. S. 1899, sec. 5053.] But the eggs belonged to plaintiffs and had been consigned to Redfearn. Hence, for the Mound City Company to pass the title, it must have had authority from plaintiffs to do so; or, if it had not, plaintiffs must have ratified the sale. According to all the testimony, Redfearn was the only agent of plaintiffs in St. Louis who had express authority to handle its produce, either by sale or reconsignment. It is denied that the Mound City Company or Johnston its secretary, had been expressly or impliedly authorized to act for the plaintiffs. Redfearn was president of the Mound City Company and the evidence goes to show controlled its affairs; and Johnston, the secretary of the company, acting in its name, had repeatedly, through the entire period of Redfearn's agency and with his knowledge and approval, sold or reconsigned plaintiffs' produce and remitted for the same in the exact manner in which the eggs in controversy were handled. Therefore it is apparent that plaintiff's contention that the title to the eggs remained in them, notwithstanding the reconsignment to Rowland & Company and the sale of the drafts, with bills of lading attached, to defendant (assuming these transactions to have been bona fide) stands on the theory that no one but Redfearn, or, in his absence, Gunn or W. P. Johnson, had the right to handle the eggs; the Mound City Company and H. H. Johnston, its secretary, having no such right. In mercantile law it is considered that a factor occupies a quasi fiduciary relation to his principal who has reposed confidence in his skill and discretion; and hence the factor cannot delegate his authority to another, unless the principal expressly or by conduct confers on him the power to delegate. [2 Clark & Skyles, Agency, sec. 840; Loomis v. Simpson, 13 Iowa 532; McMorris v. Simpson, 21 Wend. 610;

Campbell v. Reeves, 3 Head 226.] Now it is conceded that plaintiffs had consented to Gunn and W. P. Johnson acting in lieu of Redfearn when the latter was absent; but it is said they had never done so with respect of the Mound City Company, as a corporation; and there being no proof of an express authority to Redfearn to substitute the company for himself in handling plaintiffs' goods, we must look to the circumstances to see if such authority had been conferred by plaintiffs' conduct. The learned trial judge submitted this issue to the jury and the jury's finding is conclusive that no authority was conferred, unless the evidence is wholly the other way. We have given the substance of the evidence bearing on this issue. It strongly inclines to prove that by a uniform course of business extending through many months, plaintiffs had acquiesced in the sale or reconsignment of their produce by the Mound City Company in its own name, in precisely the manner in which the goods in question were reconsigned, except that there is testimony that Redfearn had not authorized the reconsignment of the cars by the Mound City Company, whereas he had authorized the reconsignment of the other cars. The effect of plaintiffs' testimony in this connection is that they were under the belief throughout the period of these dealings, that Redfearn, or in the few instances when he was absent, Gunn or W. P. Johnson, was handling their produce and using the Mound City Company's drafts to pay them; and under the belief, too, that when the transaction appeared to have been conducted in the name of the Mound City Company, it had been done under the direct supervision of Redfearn. Plaintiffs swore they had never given power to the company to handle their St. Louis shipments, and professed ignorance of the fact that said company had ever done this except when Redfearn himself reconsigned or sold the produce, reported the affair in the name of the company and paid plaintiffs in its

paper. This testimony of the plaintiffs raised an issue of fact for the jury. Redfearn had no right to delegate to the company authority to handle plaintiffs' goods; that is, to substitute the company in place of himself as plaintiffs' agent, without plaintiffs' knowledge and consent. Therefore if the company and not Redfearn reconsigned the eggs in controversy and sold defendant drafts secured on them, the transaction was not binding on plaintiffs unless authorized by the previous course of dealing; there being no question of estoppel raised by the defendant against plaintiffs. Two instructions granted for defendant submitted this branch of the case correctly. Another advised the jury that the requisite authority to the Mound City Company might be shown by circumstances; but the court refused in said instruction to tell the jury that if they found the authority to exist, the verdict should be for defendant. In view of our conclusion that there was no evidence to impeach the bank's title as a bona fide purchaser of the bills of lading for value, and none to show the transaction was to secure a debt owing by the Mound City Company, or merely to have the bank collect drafts, we hold the court erred in modifying the last mentioned instruction so as not to authorize a verdict for defendant if the jury found from the circumstances that the Mound City Company was empowered to reconsign the eggs and draw against them. The defendant was entitled to a verdict if the Mound City Company's authority was deduced from facts as much as if it was positively proved; provided the transaction was an honest sale of the drafts.

3. When plaintiffs received the Mound City Company's paper with drafts on itself for the eggs in question, they received with the drafts a letter dated July 18th signed by the Company, stating that the two drafts had been drawn to cover two like drafts drawn by it against plaintiffs' eggs, specifying the number of cases and the dates of shipment and indentifying the eggs in

controversy.    The letter further said that the Mound
City Company was unable to dispose of the eggs in St.
Louis for a satisfactory price and, therefore, had for-
warded them to New York.    Now this letter put plain-
tiffs in possession of certain facts regarding the hand-
ling of the eggs, and with knowledge of these facts they
kept the drafts and deposited them to their credit in
the Fredonia Bank.    Defendant says this was a ratifica-
tion of the sale by the Mound City Company. But plain-
tiffs swore that when they used the drafts they were
ignorant both of the insolvency of the Mound City Com-
pany and of the fact that Redfearn had not reconsigned
their eggs.    Hence they insist there was no ratification
of the reconsignment of the eggs.    Plaintiffs could not
expect to keep the drafts and repudiate the sale.    But
if, when they made use of the drafts, they were in ignor-
ance of any material fact which had occurred in con-
nection with the disposition of their eggs, no ratification
resulted from their conduct.    In view of Redfearn's tes-
timony that he neither reconsigned nor directed the re-
consignment of the property, plaintiffs' testimony that
they believed he had, and other evidence tending to
show they had no such belief, the question of ratification
is not to be determined as a conclusion of law from
consistent testimony, but presents an issue of fact.
Plaintiffs' belief that the eggs had been sold by their
authorized agent when, in fact, they had been sold by
another party, if that belief existed, was such a mis-
understanding as would prevent their use of the draft
from ratifying the acts of the Mound City Company.
It is obvious that plaintiffs could not ratify what said
company had done as their agent unless they knew the
company had assumed to act in that capacity.    [Hyde
v. Larkin, 35 Mo. App. 366; Steunkle v. Railroad, 42
Mo. App. 73; Case v. Hammond Packing Co., 105 Mo.
App. 168, 79 S. W. 732.]    We find adjudications that
retention by the owner of property of the proceeds of

an unauthorized sale, in ignorance of the fact that it was unauthorized, does not ratify the sale. [Thacker v. Pray, 113 Mass. 291, 18 Am. Rep. 480; McGlassen v. Tigerall, 44 Pac. (Ariz.) 1088; Chicago Edison Co. v. Fay, 164 Ill. 534.]

Aside from the proposition just discussed, it is insisted that as the drafts on itself sent by the Mound City Company in payment for the eggs, were dishonored, plaintiffs' use of them constituted no payment for the property unless plaintiffs intended to accept them as payment. The court instructed the jury to that effect in one of plaintiffs' instructions; a charge which introduced a misleading issue into the case. It may be granted that the drafts did not constitute payment for the eggs so as to prevent plaintiffs from proceeding against the Mound City Company in assumpsit for the value of the property, or in tort against said company, or any one else, guilty of converting it. That is to say, did not compel plaintiffs to look to the drafts for payment. [Selby v. McCullough, 26 Mo. App. 66; Johnson-Brinkman Com. Co. v. Bank, 116 Mo. 558, 22 S. W. 813.] What the answer pleads as a defense in connection with the acceptance of the drafts is not that the drafts paid for the eggs and therefore precluded plaintiffs from recovering their value in this action; but that, by retaining and using the drafts, plaintiffs ratified what the Mound City Company had done with the eggs if it had been given no prior authority. In other words, that plaintiffs ratified the reconsignment of the eggs and the sale to defendant of the exchange drawn against them on Rowland & Company, so that defendant acquired title to the property and is not liable as for a conversion of it. A subsequent ratification relates back to the unauthorized act and is equivalent to previous authority, unless to so hold would prejudice intervening rights of third parties. [Cook v. Tullis, 18 Wall. (U. S.) 332.] Therefore if plaintiffs ratified the

Mound City Company's disposition of the eggs, defendant's title is as perfect as it would have been if it had dealt with Redfearn himself. [Alexander v. Wade, 106 Mo. App. 141, 80 S. W. 19; Turner v. Railroad, 51 Mo. App. 501.] The point presented is one of some difficulty on the adjudged cases in this State, and is whether a ratification will be implied as a legal conclusion against plaintiffs, there being no element of estoppel present; for defendant was not induced to take any step which would result to its prejudice by plaintiff's acceptance of the drafts remitted to it for the eggs. Ratification of an unauthorized act performed by an agent is somewhat akin to an election between inconsistent remedies. It has been held that if a party mistakenly supposes he has two effective remedies for an injury when, in truth, he has not, and under the misapprehension adopts the wrong remedy, but forthwith abandons it before the right of any third party intervenes, he will not be cut off from his true remedy on the ground that he elected, at first, against it. As, for instance, if after a sale of goods which is voidable for the fraud of the vendee, the vendor mistakenly brings an attachment suit against his vendee, but immediately dismisses the case, he does not thereby so far ratify the sale as to preclude him from treating it as void and replevying the goods. [Johnson-Brinkman Co. v. Railroad, 126 Mo. 344.] The effect of the decisions just cited and kindred ones, is that a party shall not be deprived of his right remedy by the previous adoption of a wrong one, if permitting him subsequently to pursue the right one, will injure no one. It is not our opinion that those cases establish the rule that ratification of an unauthorized act of a party who assumed to be another's agent, depends solely on estoppel. A party may be estopped by his conduct to deny the authority of one who wrongly assumed to act for him, even though he never intended to ratify what

was done. But the general doctrine is that ratification depends on the assent of the party represented to accept what was done in his behalf and a decision to abide by it. It has been declared by high authority that ratification has nothing to do with estoppel (Justice HOLMES, 5 Har. Law Review, 19). And again it has been said to be a purely voluntary act on the part of a principal, not at all depending, in general and when no harm will result to others, on the principal's neglect to inquire about the facts before he apparently adopts what was done in his name. Subject to some exceptions which do not concern us in this case, ratification binds the principal to third parties just as though the agent had acted by authority. [1 Story, Agency (2 Ed.), sec. 244; 1 Am. and Eng. Ency. Law (2 Ed.), 12, 14, and citations in note 7.] Whether or not a ratification is to be implied is commonly a question for the jury. But where the facts looked to as proving it are undisputed, whether they suffice to prove it or not, may be a legal question. Assuming that plaintiffs knew the Mound City Company and not Redfearn had disposed of their eggs, and were aware of all the circumstances of the transaction, the deposit of the drafts sent them in payment, to their credit in the Fredonia Bank without remonstrance, ratified what the Mound City Company had done and thereby validated the sale. Indeed they had no thought of rejecting the sale until they learned the failing condition of the Mound City Company, of which they claim to have been unaware until notified by Gunn. But their long support of the credit of that company by honoring its accommodation paper and their refusal to honor a large amount of such paper a day of two before, taken in connection with Redfearn's visit to them with reference to the latter paper, go to prove knowledge of the insolvency when they accepted the drafts; though, of course, they expected the drafts to be paid before

a crash came. Defendant's counsel argue that ignorance by plaintiffs of the Mound City Company's insolvency is not a material fact on the issue of ratification, because plaintiffs were bound to inquire into its solvency before accepting the drafts and took the risk of loss if they did not. We do not accede to that proposition. Plaintiffs' knowledge of facts which should have warned them of the previous state of the company, is a circumstance from which a jury might conclude, either that plaintiffs knew the company was insolvent when they took the drafts, or intended to assent to the sale of the eggs whether it was solvent or not. [Tiffany, Agency, p. 73; Combs v. Scott, 12 Allen, supra.] The burden of proving an implied ratification and that the act of the principal relied on to establish it was done with knowledge of all the material facts, is on the party who seeks to bind the principal. [Moore v. Ensley, 112 Ala. 228.] That is to say, as ratification consists in an intention to stand by what was done without previous authority, if the intention is to be implied from actions supposed to reveal it, it must appear that such actions were done intelligently and not under a mistake. A party for whom another has assumed without authority to sell property, might well accept the usurping agent's check, with the purpose of standing by the sale, if he believed the agent was solvent, though he would repudiate the transaction if he knew the check was worthless. And if he accepted the check supposing the agent was solvent when he was not, he might afterwards repudiate the sale provided no third party would be prejudiced; as, for instance, by being prevented from taking steps to collect from the agent. If such prejudice would result, a ratification by estoppel would arise; being imputed by legal fiction for the sake of justice. Our conclusion is that the question of ratification in this case is one of fact and not of law. If it be found that plaintiffs, with sufficient knowledge

of what had been done to enable them to exercise an intelligent choice between rejecting and approving the sale of their eggs by the Mound City Company, retained said company's drafts on itself sent in payment for the eggs, they thereby ratified the sale of the eggs to defendant and defendant's subsequent sale of them and retention of the proceeds did not constitute a tortious conversion but were lawful acts, affording plaintiffs no ground of recovery. [Beall v. January, 62 Mo. 434; Ames v. Tucker, 8 Mo. App. 95; Cochran v. Chitwood, 59 Ill. 53; Eadie v. Ashbaugh, 44 Iowa 519; Lythgoe v. Vernon, 5 Hurlst. & N. 179; Sanders v. Peck, 87 Fed. 61; Clor v. Kelly, 63 N. Y. Supp. 339; Frank v. Jenkins, 22 Ohio St. 603; Leavitt v. Fairbanks, 92 Maine 523.]

4. We take up now the exceptions saved to the admission of testimony.

a. The record is not very clear as to whether or not the letters said to have been written by Redfearn to plaintiffs at different times, regarding various cars of produce sold in St. Louis, had been lost or destroyed so as to make secondary evidence of their contents admissible. We incline to the opinion that a sufficient showing was made. As we understand, either Babb or Smith swore that a great deal of plaintiff's correspondence was destroyed every thirty days and, further, that Babb had collected all the letters he could find relating to the dealings between plaintiffs, Redfearn and the Mound City Company, and had turned them over to his attorney who had delivered them to defendant's attorney. As the case has to be retried and proper proof of the loss or existence of the letters can be made, it is unnecessary to dwell on this point.

b. The telegram sent by Gunn in the name of the Fredonia Produce Company to Rowland & Company and the latter's response, could not have prejudiced the defendant. They contain no statement of

facts which were not testified to by witnesses. Plaintiffs' telegram says nothing which can be construed as a self-serving declaration, except that the eggs belonged to them a fact to which they both testified. (c) Redfearn's telegram to plaintiffs dated July 23, 1904, and the letter Gunn wrote them July 19, 1904, were very prejudicial and should not have been admitted. As to defendant they were hearsay and incompetent. It was also incompetent for Smith to testify that he learned from Gunn's letter that the Mound City Company had drawn against the eggs without Redfearn's knowledge. As to whether the eggs were handled in the usual course of business and whether their reconsignment by the Mound City Company was directed by Redfearn, there were issues of fact. According to Johnston, Redfearn ordered the reconsignment. Letters which passed between plaintiffs and third parties containing statements that the transaction was without Redfearn's knowledge, were not competent. It is said these letters and telegrams were admissible to show plaintiffs did not ratify what the Mound City Company had done, but repudiated it. No one denied that plaintiffs rejected the company's action after they learned it was insolvent and that its drafts would not be paid. The question was whether plaintiffs had already ratified what the company had done; and these letters, in so far as they bore on that issue in plaintiffs' favor, were hearsay. They tended, too, to create an impression against the Mound City Company's prior authority to represent plaintiffs and against the good faith of the defendant. They were inadmissible on any theory of the case that occurs to us. [Fountain v. Railroad, 114 Mo. App. 676, 683, 90 S. W. 335; Bain v. Clark, 39 Mo. 252.]

The judgment is reversed and the cause remanded. All concur.