# THE SEDALIA NATIONAL BANK, Appellant, v. ECONOMY STEAM HEATING & ELECTRIC COMPANY, Respondent.

**Kansas City Court of Appeals, June 28, 1910.**

1. **BILLS AND NOTES: Principal and Agent: Non-trading Corporation.** The defendant, whose principal officers and stockholders lived in New York, conducted in Sedalia the business of heating by steam public buildings, business houses, etc. Robert Mowbray was the local representative. He was really only an employee with limited powers, though he carried the title of vice-president and general manager. For several years he was accustomed to borrow money for his own purposes, in the name of his company, but not with the knowledge or authority of any of its officers. To take up this indebtedness he executed the note in suit. The corporation was not liable on the note.

2. ———: ———: ———: **Ratification: Negligence.** The evidence was not sufficient to show that defendant knew of Mowbray's misconduct and ratified his acts, or that it was negligent in not knowing of his misconduct.

3. ———: ———: ———: ———. A non-trading principal does not owe the same vigilance to guard against the possible fraudulent or unauthorized acts of his agent as does a trading principal.

4. ———: ———: ———: ———. While the apparent authority of a manager of a trading corporation is co-extensive with the scope of all managerial requirements and necessities, the manager of a non-trading corporation has not the same powers. There is no implied power of the general manager of a non-trading company to borrow money and emit the notes of the company, and strangers dealing with him are bound to take notice of his lack of authority.

**Appeal from Pettis Circuit Court.**—*Hon. Charles Hoffman*, Judge.

AFFIRMED.


*Sangree & Bohling* and *W. M. Williams* for appellant.


(1)   Defendant corporation clothed its vice-president and general manager in the city of Sedalia with apparent authority to represent and act for it in negotiating the loan represented by the note sued on, and in executing said note in its name and behalf, and should have known of his habit of making such loans.   It ought not now be heard to deny his authority to bind it upon the note sued upon, even though no express authority to the officer executing the note was shown, and he subsequently became a defaulter to the corporation.   Hennessy, etc., Co. v. Bank, 129 Fed. 557; Bank v. North Missouri, etc., Co., 86 Mo. 125; Glidden, etc., Co. v. Bank, 16 C. C. A. 534; Watson v. Mfg. Co., 61 S. E. 273; Buckwald, etc., Co. v. Hearst, 75 Atl. 113; Keas v. Lime Co., 71 Mo. App. 109; Moore v. Gaus and Sons Mfg. Co., 113 Mo. 116; Sparks v. Trans. Co., 104 Mo. 539.  (2)   Defendant corporation kept a bank account and had pass books.   These pass books, upon their face, showed that defendant was being given credit in its bank account for loans represented by the notes introduced in evidence.   A comparison of the pass books with the company's other books   would have   disclosed   the loans.   It was defendant's duty to examine   its   pass books, and it must be held to have constructive notice of what such an examination would   have   disclosed. Hennessy, etc., Co. v. Bank, 129 Fed. 1. c. 560; Bank v. Morgan, 117 U. S. 96; Bank v. Bank, 6 C. C. A. 183; Myers v. Bank, 44 Atl. 280; Bank v. Allen, 27 L. R. A. 431; Quatrochi Bros. v. Bank, 89 Mo. App. 500.   (3) A corporation is bound by the acts of its general mana-

ger, even though in excess of his actual authority, where it has held him out to the public as possessing such authority. 10 Cyc. 924; Rosenbaum v. Gilliam, 101 Mo. App. 126; Citizens, etc., Co. v. Thornton, 174 Fed. 760. (4) Plaintiff cannot be affected by any limitation of the authority of the manager of the defendant corporation contained in its by-laws or in instructions given to him, of which it had no notice. 10 Cyc. 925; Electric Co. v. Walsh, 105 N. W. 1; Alton v. Cotton Mills, 44 So. 654; Jones v. Williams, 139 Mo. 1; Bates v. Keith Iron Co., 48 Mass. 224; St. Clair v. Rutledge, 105 Wis. l. c. 592; Buskwald, etc., Co. v. Hearst, 75 Atl. 113.


*Charles E. Yeater* for respondent.

(1) The defendant company, engaged exclusively in the business of selling steam for heating purposes, was a small non-trading corporation, with its plant idle half the year; consequently, either explicit authority, long custom or usage recognized by the company, or express ratification, is necessary to make the note sued on a valid obligation. Hyde v. Larkin, 35 Mo. App. 365; Bank v. Hogan, 47 Mo. 472; Bank v. Tel. Co., 51 Pac. 829; Craft v. Railroad, 150 Mass. 207. (2) The contention that the execution of the notes signed by Mowbray, in the name of the company, was acquiesced in and therefore constitute a custom and usage, or have been ratified, is untenable, because, such notes were secretly, fraudulently and criminally issued by the manager, for his own benefit, and no other officer of the company had any knowledge whatever of them; and an acquiescence in or ratification of an unknown act is a logical impossibility. Windsor v. Bank, 18 Mo. App. 675; Hyde v. Larkin, 35 Mo. App. 373. (3) There

is no evidence whatever that the plaintiff bank ever issued a pass book to defendant, and both plaintiff's and defendant's evidence shows that defendant did not know that it had an account at plaintiff's bank, and there is therefore no inference to be made therefrom of defendant's ratification of Mowbray's acts. Keyser v. Hinkle, 127 Mo. App. 74; Inv. Co. v. Bank, 96 Mo. App. 142, 103 Mo. App. 617; Hickman v. Green, 123 Mo. 176; Bank v. Lovitt, 114 Mo. 525.

JOHNSON, J.—This action is upon a negotiable promissory note for four thousand two hundred dollars payable to the order of plaintiff bank and signed by Economy Steam Heating & Electric Company, per Robert Mowbray, vice-president and manager, and by Robert Mowbray individually. The note was dated December 22, 1906, and was made payable ninety days after date. No part of it, either principal or interest has ever been paid.

The answer of the defendant corporation was a plea of *non est factum,* the individual defendant made no defense and suffered judgment to go against him. By agreement of parties a jury was waived and, after hearing the evidence, the court rendered judgment in favor of the defendant corporation. Plaintiff appealed.

The facts of the case, about which there is little controversy, thus may be stated: The American District Steam Company of Lockport, N. Y., engaged in the business of manufacturing and operating steam heating plants, installed a plant of that character in Sedalia under contract with a local corporation and failing to receive payment of the agreed price, caused the property to be sold under legal proceedings and became the purchaser. The officers of the company then caused the defendant company to be organized and incorporated under the laws of the State of Missouri for

the purpose of owning and operating the business. There were five stockholders of defendant company, three of whom resided in Missouri, the other two in New York. The Missouri stockholders each owned one share and the remainder of the capital stock was owned by the two New York men, one of whom was elected president and the other secretary and treasurer. The defendant Mowbray was elected vice-president and manager and assumed the management of the business in the fall of 1900.

The business of the company was the manufacture and sale of steam heat for use in public buildings, business houses and residences in Sedalia; Mowbray was the only representative of the company in Sedalia and he acted as general manager of its business for something more than six years. He was discharged from the services of the company upon the discovery that he was a defaulter and embezzler of its funds. The total volume of business transacted by the company under the management of Mowbray was approximately $90,000, or about $15,000 per year. There was no demand for the company's product in the summer months and during such periods the plant remained idle. The principal duties of Mowbray were to purchase coal and other supplies, procure customers, collect bills and make weekly reports to the secretary whose office was in Lockport. The business being small there were but few employees. The by-laws of the company provided: "The board of directors may engage a general manager or superintendent who shall have the general supervision of the operation of the company's property and the transaction of such other business as is necessary in the absence of the officers of the company. He shall not have the power to create debts or obligations without the consent of such officers of the company as have the vested right to create such indebtedness."

The installation of extensions to the plant was not entrusted to Mowbray but was performed under the personal supervision of the president, and, in fact, as well as by the provisions of the by-laws, Mowbray's authority and duties were restricted to matters of routine business. When the business ran behind, funds were sent from Lockport in anticipation of the requirements of the business beyond its income.

Shortly after he took charge of the business in 1900, Mowbray opened a bank account for the company with one of the Sedalia banks and began borrowing money on the company's paper which he executed as vice-president and general manager. He deposited the proceeds of the collections and checked against the account in making disbursements on account of the company. He also checked against it for his own purposes but signed the company's name to such checks. He continued this practice for six years and in the latter part of the year 1906, owed the Citizens' National Bank where the account was kept, a note of $3800 to which he had signed the defendant's name. Pressed for payment of this note, he applied to the cashier of the plaintiff bank for a loan of $4200. The cashier knew that defendant company kept an account with the Citizens' National Bank for he had often noticed the checks of the company in the clearing house, but he did not know that Mowbray had borrowed money on the corporate name of defendant. We quote from the testimony of the cashier:

"When he (Mowbray) came for the money he said that he had concluded to change his account over to our bank and I asked him how much money he wanted. He took his pencil and figured around awhile and said, 'I will want about $4200,' and he said 'I owe the Citizens' Bank about $3600, I don't know the exact amount.' He said 'I have not noticed the account lately and I will want about $600 to pay for coal.' I then asked him if he was authorized to borrow money and he

said he was. He said 'I have been borrowing money ever since I have been here of all the banks.' He said 'I have an account with all three of the banks here.' . . . He told me he had authority to borrow money. I asked him explicitly about it. I asked him how he signed notes and he said the Economy Steam Heating Company by himself as vice-president and manager. He said 'I am manager and vice-president of the company.' I said 'The Department criticises a loan made in that way,' . . . and he said he would sign the note individually, and I said, 'That is all right,' and I wrote out the note and he signed it and I gave him credit for it. I opened the account and the account has been with the bank from that day to this." The note was renewed once or twice before the exposure of Mowbray's defalcation and duplicity. The officers of defendant refused to acknowledge the note held by plaintiff as a valid obligation and this suit followed. The former note held by the Citizens' National Bank was paid out of the proceeds of the loan and there is some evidence to the effect that some freight bills for coal used by the company were paid out of the proceeds. It is not disputed that the note of $3800 represented money obtained by Mowbray for his own individual use and that in addition to that amount, he embezzled several thousand dollars from money that came into his hands from collections. There is no evidence that the plaintiff issued a pass book to Mowbray, but there is evidence that he was issued pass books by other banks with which he had done business and that the proceeds of the loans made by those banks were entered on the pass books.

These are the salient facts of the case and since they are not in dispute, the question of the liability or non-liability of defendant on the note in suit is one of law and not of fact. That, as vice-president and manager, Mowbray was empowered to bind the corporation by his acts performed within the scope of his authority, there can be no question, and the matter at issue is

whether or not the right to borrow money and issue the promissory notes of the corporation was one of the powers included within the scope of those he possessed. While he bore the title of vice-president and manager and was in charge of the office and business of the corparation at Sedalia, the actual scope of his powers and duties as defined by the by-laws, instructions of his superior officers and method of doing business, was so restricted that his real relation to the Lockport officers who were the practical owners of the business was that of a mere employee and his official title was more complimentary than definitive or descriptive. He had no actual authority to borrow money on the credit of the corporation or to emit commercial paper in its name. His act in borrowing money on the credit of the corporation for his own uses was fraudulent, but had he borrowed in good faith for the uses of the corporation his act would have been *ultra vires* the scope of his real authority.

But it is argued by plaintiff that the culpable acts of Mowbray were within the apparent scope of his authority and since plaintiff had no notice of the curtailment by defendant of the powers usually exercised by general managers of such corporations, defendant is bound by the acts of its manager though they were in excess of his actual authority. It has been said with respect to trading corporations that the apparent powers of the general manager are coextensive with the powers of the corporation. That statement, perhaps, is too sweeping, but we are within conservative limits when we say that the apparent authority of a manager of a trading corporation is coextensive with the scope of all managerial requirements and necessities.

"The authority of a corporation or its officers to issue promissory notes need not be expressly given by its by-laws, nor by the formal resolution of the board of directors. Such authority can be inferred from the acquiescence of the corporation or recognition of it by

the acts of its accredited officer in the regular order of its authorized business." [Bank v. Coal & Mining Co., 86 Mo. 125.]

But our concern now is not with rules pertaining to trading corporations. Defendant was a public service corporation and as such belonged to the class denominated non-trading corporations. The implied powers of the general manager of such corporations do not include authority to borrow money and to emit the notes of the corporation. [Hyde v. Larkin, 35 Mo. App. 365.] In that case we said:

"In Hazelton Coal Co. v. Megargel, 4 Barr. 324, Chief Justice Gibson, after stating that there was no proof of any special authority, says: 'And what is the authority of the president of a company incorporated, not for the purposes of banking or any object connected with currency, but for mining and marketing coal? The powers of such an officer are much more restricted than the operations of a banking one.' In the case of the New York Iron Mine v. Bank, 39 Mich. 651, it was insisted by counsel that the general agent of a mining corporation as a matter of law by virtue of his appointment, had authority to bind it by commercial paper and that the court should take notice of his authority as it would of the authority of a bank cashier; but the court held that issuing promissory notes is not a power necessarily incident to the conduct of the business of mining. That it was a power so susceptible of abuse that the law wisely left it to be conferred or not, as the directory might determine. I am firmly persuaded that the president, general agent or manager of a mining corporation cannot, by virtue of his office *merely* assign the assets of the corporation. He must have some warrant from the charter, the directory or the custom and usage of the corporation. It is certainly the safer and more conservative rule, and commends itself to sound reason. If it were not so, such officer might act in disregard of the board of directors and might by the mere power inherent

in his office, transfer the entire assets of the corporation."

In banking and mercantile pursuits the necessities of business frequently demand quick action in the borrowing of money and to meet such emergencies, it is customary for the chief executive officer to be clothed with the power to borrow money on behalf of the corporation. Usage and custom have invested him with the implied power thus to bind the corporation. But with the non-trading corporations such as defendant, there are no such necessities and there is no reason for bestowing on the executive officer implied authority to plunge the corporation into debt. The income and outlay may be forecast with reasonable accuracy and the pecuniary wants of the corporation supplied without recourse to emergent action. We conclude that Mowbray possessed neither express nor apparent authority to borrow money on behalf of defendant and that strangers dealing with him were bound to take notice of his lack of authority. We do not think there is anything in the argument that defendant ratified these acts of Mowbray. The evidence shows that defendant had no knowledge of the fraudulent conduct of its agent and it is a self-evident proposition that there can be no ratification without knowledge express or implied. We quote again from our opinion in Hyde v. Larkin, supra:

"We find no evidence of ratification by the corporation. There could be no ratification without knowledge, and it does not appear that the board knew the account was assigned, or even that the money used in paying the hands was borrowed. . . . The question is whether the unauthorized assignment of the assets of the corporation to secure the loan has been ratified? In order to have been ratified, it must have been known to the corporation. Knowledge of payments made to the hands with borrowed money, is knowledge that in borrowing that money, the agent has made an unauthorized transfer of assets to secure it. If the ratification by the cor-

poration of the unauthorized contract of the agent consists in its having received the consideration of the contract, it must be proved that the corporation, through its proper officers, knew of the terms of the contract, and on what account the money was received by them."

Finally, it is contended that defendant is bound to pay the note for the reason that by a course of dealing extending over a period of six years, it held its manager out to the world as invested with authority  to  issue the notes of the corporation for borrowed money.  Reduced to its final analysis the argument is found to depend entirely on the fact that the pass books issued to Mowbray by the banks where he transacted business as a depositor were issued in the name of the company and contained entries relating to the loans. It is argued that the bankers were justified in believing that these pass books would be examined at periodical examinations of the manager's books and that the failure of defendant to discover the rascality of its manager was due to the negligent omission to act in the manner to be expected of an ordinarily careful and prudent person in its situation.  The principal authority relied on by plaintiffs to sustain this contention is the case of Hennessy v. Bank, 129 Fed. 557.  There a building company in Chicago obtained a large building contract in Memphis and sent a local manager to take charge of the operations. He opened an account for the company with a bank in Memphis and from time to time overdrew the account with the knowledge and tacit consent of his principal. He took advantage of the situation to draw money and convert it to his own use.  He executed notes of the company to the bank to cover overdrafts created wholly or in large part by his defalcations.  The pass book issued to the company and kept by the manager showed these transactions.  The court held:

"But it is urged that Evans was a rogue, and was contriving in his own interest to put some of the money he should get from the bank on the credit of his com-

pany to his own uses, and that, therefore, the information given by the pass book should not be imputed to his principal. The rule of law thus invoked is not applicable. It is applicable when the agent leaves his place as agent, and, in derogation of the rights of his principal, concocts and carries into effect some scheme of his own for his private advantage, and where the other party knows or has good reason to believe that the agent is acting falsely. But there is no reason here for charging the bank with notice of any wrongful purpose of the company's agent. It returned the balance pass book to the person put in place by the company to receive and examine it and take steps to correct anything objectionable which the book indicated. The bank had a right to expect that the company would do its duty in this regard, and the company is affected by notice of the contents of the pass book to the same extent as if the agent had been an honest one. It was so held by this court in First National Bank of Evansville v. Fourth National Bank of Louisville, 16 U. S. Appeal 1, 56 Fed. 967, 60 C. C. A. 183. And see Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; First National Bank v. Allen, 100 Ala. 482, 14 South 335, 27 L. R. A. 426, 46 Am. St. Rep. 80. This contention of the defendant runs counter, as, indeed, does its entire defense, to the settled rule, that, when one of two persons is to suffer by the act of an agent entrusted by his principal with the appearance of authority to do the act, that one shall take the burden whose agent committed the wrong. We think this is a plain case for the application of that doctrine. It seems to fit the undoubted facts, and we can see no valid reason why the consequences of the dishonest conduct of the agent toward his principal should be shifted from the company to the bank, which appears to have acted in good faith."

But an important distinction between the law of that case and the one in hand rests on the difference in vital facts. The manager there did have authority from

his principal to borrow money, since an overdraft on one's bank is but one way of obtaining a loan; while here, the manager had no right to borrow money in any form. The liability in that case was properly founded on the act of the corporation in giving power to its agent which he abused, but here plaintiff would create a liability from the mere failure of the principal to discover the fraud and wrong of his agent, not committed in the performance of delegated authority or within its legitimate or even apparent scope, but in defiance of authority and in furtherance of the purely selfish fraud of the agent. Defendant had no course of business with respect to borrowing money from the Sedalia banks. In common with plaintiff, it was the victim of dishonesty and we say that the predicament in which plaintiff finds itself is due to its own negligence in not requiring Mowbray to exhibit his authority to bind his corporation to the proposed transaction. Though defendant knew that Mowbray kept a bank account, it had no reason to anticipate that he would turn rascal and since he was not authorized to run the company into debt, we shall not hold defendant was negligent and guilty of an imposition on the commercial world in not making examinations of the pass books. Here again it is important to bear in mind the essential difference between trading and non-trading corporations. Presumptions that apply to one class do not necessarily apply to the other.

It follows from what we have said that defendant incurred no liability on account of the note in controversy.

The judgment is affirmed. All concur.