JOHN C. SCRIVNER (Plaintiff) v. AMERICAN CAR AND FOUNDRY COMPANY, a Corporation (Defendant), Appellant.—50 S. W. (2d) 1001.

Court en Banc, May 24, 1932.

*Hardy & Stancliffe* and *Watts & Gentry* for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondent.

FITZSIMMONS, C.—This is an action upon a written contract of lease by plaintiff to defendant of a patent for an improvement

in hydro carbon furnaces. Plaintiff recovered judgment for $290,-000, of which $200,000 was principal, $50,000 was accrued interest from September 28, 1924, to October 28, 1928, the date of the verdict, and $40,000 was attorneys' fees, for which the contract provided. Defendant appealed after its motion for a new trial had been overruled. Defendant, by its verified answer, denied the execution of the pleaded contract. Plaintiff by affidavit alleged that he had lost the original contract, and he was permitted to offer secondary evidence of its contents. As the ten-day trial of the case was a prolonged contest over the fact of the contract and its ratification, the text of it is here set out as follows:

"This contract made and entered into this 28th day of September, A. D. 1911, by and between JOHN C. SCRIVNER of the TOWN OF MADISON, COUNTY OF MADISON, and STATE OF ILLINOIS, hereinafter referred to in this CONTRACT as the Party of the First Part, and the AMERICAN CAR and FOUNDRY COMPANY, having a plant located at MADISON, COUNTY OF MADISON, and STATE OF ILLINOIS, hereinafter referred to in this CONTRACT as the Party of the Second Part.

"WITNESSETH:—That the Party of the First Part, is possessed of and the owner of a certain Patent on a HYDRO-CARBON-FURNACE granted to him by the UNITED STATES GOVERNMENT, on the 19th day of September, A. D. 1911, number of said Patent 1003522.

"WHEREAS:—The Party of the First Part is desirous of leasing the above mentioned Patent, to the Party of the Second Part for the term of THIRTEEN YEARS.

"WHEREAS:—The party of the Second Part is desirous of leasing the above mentioned Patent, from the Party of the First Part for the term of THIRTEEN YEARS.

"NOW THEREFORE, for and in consideration of this Contract and Lease, and the use of the above mentioned patent, by the Party of the Second Part, and the further consideration of the mutual covenants and agreements hereinafter contained in this Contract, it is hereby agreed by and between the Parties hereto as follows: The Party of the First Part hereby leases the above mentioned Patent, for the term of Thirteen Years from the day and year first above written, to the Party of the Second Part. The Party of the Second Part for and in consideration of this Lease, and the use of the above mentioned Patent, for the above mentioned time Thirteen Years, agrees to pay to the Party of the First Part the sum of Two Hundred Thousand ($200,000) Dollars, at the expiration of the Thirteen Years from the day and year first above mentioned.

"It is further understood and agreed by and between the Parties hereto that the Party of the Second Part shall have the right to build, manufacture and use the said above described furnace which said Patent was granted on, in all plants owned and controlled by the Party of the Second Part.

"It is also understood and agreed by and between the Parties hereto that the Party of the First Part shall have the right to manufacture and sell said furnace to any other person or company. Party of the First Part may sell said Patent to any person or Corporation, any sale hereinafter made by the Party of the First Part shall not interfere with the Party of the Second Part.

"Party of the Second Part agrees to pay Two Hundred Thousand Dollars, Thirteen years after the date of this contract to the Party of the First Part, if not paid at maturity then said amount will draw six per cent interest.

"If for any reason the above amount should not be paid when due and the Party of the First Part places this contract in the hands of attorneys for collection, then the Party of the Second Part agrees to pay all attorneys' fees and cost in addition to the principal and interest.

"The Party of the Second part hereby agrees that in case their plant or plants should be closed down, or for any unforeseen reason they should abandon the use of said Patent Furnace this contract shall remain in full force and binding and the Two Hundred Thousand Dollars will be due and payable at the expiration of the Thirteen Years from the day and year first above written in this contract.

"This Contract shall be binding on the Party of the First Part and on his Heirs, Administrators, Executors, or Assigns, also shall be binding on the Party of the Second Part, and on its successors and assigns.

"This contract is issued in duplicate originals of which each party holds a copy, which constitutes our entire agreement and shall be binding.

"ROBERT L. FOGELMAN, the undersigned hereby states that he is employed by the American Car and Foundry Company. He further states that he is Superintendent and General Manager of the said Company.

"IN WITNESS WHEREOF, the Parties hereto have signed this contract this 28th day of September, A. D. 1911.

"Party of the First Part by

"JOHN C. SCRIVNER.

"Party of the Second Part by

"AMERICAN CAR AND FOUNDRY COMPANY,

"By ROBERT L. FOGELMAN."

Plaintiff in his amended petition pleaded that contract according to its legal effect in two counts. He alleged in each count that he had fully performed the contract, but that defendant failed to pay the named consideration of $200,000 at the end of the thirteen years' lease term on September 28, 1924. Judgment for the rental, interest and attorneys' fees was accordingly prayed. The first count pleaded the authority of Robert L. Fogelman to execute the contract on behalf of defendant. The second count pleaded ratification by defendant of the contract executed by Fogelman in that defendant, its directors and managing officers, had knowledge of its making, before, after and at its date, September 28, 1911; that with this knowledge defendant set up in its plants in Missouri, Illinois and other states the furnace covered by the patent and that defendant continued to use it and to enjoy the benefits of the contract for about eleven years. At the close of plaintiff's case, the court sustained a demurrer to the first count, but it overruled demurrers to the second count both at the close of the plaintiff's case and of the whole case. Upon the record before us the appeal brings up only the issues joined upon the second count and the trial and judgment thereon. The learned trial judge, upon overruling defendant's motion for a new trial, placed in the record the following memorandum:

"The court still has some doubt as to the sufficiency of the evidence in this case to establish a ratification of the contract forming the basis of the action, as expressed to counsel when overruling the demurrer to the evidence at the close of plaintiff's case, but, since this question must be eventually determined by the Supreme Court, I believe justice will be best served by overruling the motion for a new trial."

Thus it is that the ruling of the trial court upon the demurrer is the essence of the appeal, even though defendant would seem to have us pass upon questions of fact.

The trial of the case below and the decision of it upon appeal are not made easy by the fact that death took heavy toll of those whose names and activities appear in the record. Between the date of the execution of the contract in September, 1911, and the trial in October, 1928, there passed on Mr. Eaton, President of defendant American Car and Foundry Company; Mr. Fogelman, who is alleged to have executed the contract on behalf of defendant; Mr. Lewis, who was Fogelman's stenographer; Mr. Boyer, Fogelman's office manager; Mr. Thompson, Assistant General Manager of defendant, and Mr. Lemaster, an attorney who is said to have represented plaintiff in the negotiations and drafting of the contract.

*Foreword about Furnaces*:—Defendant admitted that the United States had granted to plaintiff, John C. Scrivner, letters patent on a rivet-heating furnace. Defendant had seventeen plants scattered

over ten states. Its main business was the manufacture of railroad cars and equipment. Heated rivets were used in fastening together steel parts of cars. These rivets were heated in furnaces, which stood beside the construction tracks in the plants. Until the defendant company installed electric heating furnaces in 1923 it used oil-burning furnaces. These furnaces were made of fire brick, were oblong in outside shape, ranging from two to three and one-half feet in length, and had an arched ceiling or roof for the better distribution of the heat. Boys with tongs put rivets into and took them out of the furnaces by means of lateral openings at floor level. All furnaces, whether identified by witnesses as Scrivner furnaces or otherwise, had within them a "bridge wall" or "splash rock" or "baffle," against which the fuel oil, mixed with air, was driven and, may we say, atomized for more perfect and intensive combustion. Of this baffle as a distinctive feature of the Scrivner furnace more will be said later. Suffice it to say for the present that plaintiff, in his application for the patent which was granted to him, claimed for his invention by way of "new and useful improvements in furnaces," that it provided "a removable blast or bridge wall;" an arched top with "a slot for the insertion and removal of the bridge wall;" and "an elongated opening in the side of the heating chamber of the furnace through which the materials to be heated are inserted."

1. *Of the Making of the Contract*: Edward Hayden Scrivner, older brother of the plaintiff, John C. Scrivner, testified that he was in the office of Morgan Lemaster, now dead, an attorney in Granite City, Illinois, on Tuesday, September 26, 1911. Others present were the plaintiff, also Mr. LeMaster, acting as attorney for plaintiff, Robert L. Fogelman, now dead, "claiming to represent the American Car and Foundry Company," and Mr. Thompson, now dead, assistant general manager of defendant. The witness took no part in the conference, but he testified that the others discussed "a contract with reference to the use of the Scrivner patented furnace." He learned from the discussion that the amount of the contract was to be $200,000. Mr. Lemaster made notes during the conference, but they did not sign the contract that day. They agreed to meet again on Thursday, September 28, 1911. Mr. Thompson said that whatever Fogelman did would be all right; that he, Thompson, was going back to Chicago, his home and headquarters, that "he wouldn't be back at all until Thursday and for Fogelman to go ahead." The same persons, except Thompson, met again in Mr. Lemaster's office on Thursday, September 28, 1911. Mr. Lemaster then dictated the contract to his stenographer, Miss Clara E. Kaiser, who typed it as Mr. Lemaster dictated. The contract was signed in duplicate by the plaintiff and by Mr. Fogelman each of whom then took a signed copy. Plaintiff's counsel handed to the witness, Edward H. Scrivner, a paper marked

Plaintiff's Exhibit B and described as a paper purporting to be a copy of the contract between plaintiff and defendant. The witness testified that he recognized it and could identify it as a copy of the original. He added that he did not know where the original was. Cross-examination of the witness about his identification of Exhibit B was long and severe. Defendant makes the testimony of this witness on cross-examination one of the strong points of his appeal. Scrivner testified that he read the original contract, when it was signed on September 28, 1911, over seventeen years prior to the trial. He read Exhibit B in the office of his brother's lawyer, about a week before the trial and again about fifteen minutes before he was called as a witness. Exhibit B "reads just like the original," and he thought it was the same thing. He also testified: "From their talk and from reading the contract, I could tell the copy was the same thing. From what I know about the contract it was the same thing." But later, he said: "I claim to know that each word of the typewritten part is exactly like the document that I read once seventeen years ago. That is the same thing, the best I remember. I don't remember just how the fourth or fifth paragraph starts out; I just read the whole thing through. I didn't pick out any special ones."

Counsel for defendant quoted parts of Exhibit B and asked the witness whether he knew that those words were in the contract. The witness answered that he didn't know whether the quotations were in there or not, and he indicated in some of his answers that counsel for defendant "might read it wrong."

Hayden Scrivner testified that at the time of the trial, he was in the real estate business and ran a hotel at Mt. Vernon, Illinois, and that in September, 1911, he was farming near Mt. Vernon. Twelve witnesses, called by defendant, and living at or near Mt. Vernon, swore that Hayden Scrivner's reputation for honesty and integrity was bad. In rebuttal, seven witnesses from Mt. Vernon and vicinity testified that his reputation was good. The impeachment of a witness as to his general reputation for veracity has no tendency to show that the witness is incapable of speaking the truth. Such evidence, even when not rebutted, has to be weighed in connection with surrounding circumstances for the purpose of determining to what extent the witness should be credited. And the duty of adjudging credibility is for the jury in the first instance and later for the trial court in passing upon the motion for a new trial.

Clara E. Kaiser, a stenographer living in Granite City, Illinois, and, at the time of trial, employed by a furniture store, was in 1911 in the service of Mr. Morgan Lemaster, the attorney in Granite City, mentioned in the testimony of Hayden Scrivner. She remembered that she typed, at the dictation of Mr. Lemaster, a contract between John C. Scrivner and Robert L. Fogelman who signed as the repre-

sentative of the American Car and Foundry Company. She further testified that plaintiff's Exhibit B "has the same substance in it as the original contract I. drew up between those people. It is the same with reference to the terms of the contract in substance and in the same form. The contract was executed in the office of Morgan Lemaster. I have no way of remembering the date. It was shortly after the patent was received. The date on this Exhibit B is September 28, 1911. That is correct. I recognize Exhibit B as being a copy of that contract; it is the same form and substance." She also testified that, at the time that the contract was signed, there were present the plaintiff, John C. Scrivner, his brother, Hayden Scrivner, Mr. Fogelman and Mr. Lemaster. She did not know or remember Mr. Thompson. To the best of her recollection he was not present at the time that the contract was signed, and none of the persons mentioned was at the office two days before.

On behalf of defendant, many witnesses, including Mr. Charles J. Hardy, general counsel and a member of the Board of Directors of defendant, Mr. Frederick H. Gibbs, its patent attorney, the President, the Treasurer, the Secretary, junior officials, senior clerks of the American Car and Foundry Company and former officials and employees, testified as to the procedure of the company with respect to a contract of the nature of the one sued on. Before its execution on behalf of the company the President or General Manager would forward such a contract to Mr. Hardy for his O. K. If it involved a patent he would send it to Mr. Gibbs for his opinion on questions of infringement. Mr. Hardy and Mr. Gibbs in 1911 and thereafter kept memos of their action on contracts of importance. All miscellaneous contracts, that is all contracts except those for the sale of cars, were noted and indexed in a book which was kept in September, 1911, and thereafter and which was offered in evidence. Each contract was filed by number corresponding to the number in the book and to the same number in a card index system which was installed after 1911. All contracts involving future payments of money also passed through the bookkeeping department where appropriate entries were made in ledgers and other account books. Each witness in his proper department and sometimes several such witnesses testified that he or they together or successively had examined the contract book, the contract card index, the contracts, the ledgers and other books of account, the private memos, and found no record of or reference to the Scrivner furnace contract. No lawyer, officer, employee or former officer or employee had any knowledge or recollection of such a contract.

■ We have yet to examine the question of the admissibility of plaintiff's Exhibit B, the purported copy of the contract, concerning which Hayden Scrivner and Miss Kaiser testified. But it may be well to determine now the merits of defendant's point that "the evidence

of Hayden Scrivner, brother of the plaintiff, is so preposterous and so contradictory in its various parts that it constitutes no substantial evidence whatever and should be disregarded.'' And, he doesn't hesitate in support of this contention, to denounce the testimony of this witness as perjury. The testimony of Rosier Scrivner and of Wilford Scrivner, which has not yet been mentioned in this narrative is denounced by defendant with the like vehemence as a ''fairy tale,'' ''preposterous'' and ''unbelievable'' and therefore to be disregarded by this court in passing upon the demurrer, even as Rosier Scrivner's testimony should be.

What is substantial evidence has been before this court many times in cases in which the briefs of appellants gave a flavor of untruth to the testimony of opposing witnesses. The case which is most in point here would seem to be Ketter v. St. Louis Butchers' Supply Company, 229 S. W. 173, 1. c. 175. In that case the court in an opinion by GRAVES, J., said:

''In this case the personal testimony of the plaintiff is to the effect that there was no guard on the machine to be used upon this saw. The great weight of the evidence is against this testimony, and the adverse testimony comes from plaintiff's other witnesses, as well as those of the defendant. It will not do to say that all the substantial testimony upon this one question is against the plaintiff, because the testimony of plaintiff is substantial, if it was to be believed.

''The one question under the pleadings is: Had the defendant furnished a guard for the saw? The great weight of the evidence shows that such a guard was on the machine for use by the employees. One cannot read this record without concluding that plaintiff stands alone on this question, and without having strong suspicions that he has prevaricated in his own interest. But his evidence is there, and what shall we (an appellate court) do with it?

''We have heretofore ruled that the credibility of the witnesses is a matter for the jury. (Cases cited.) On the other hand, we have ruled that, if the trial court sets aside the verdict upon the ground that it is against the weight of the evidence, we will not disturb such ruling. [Kinlen v. Railroad, 216 Mo. 1. c. 176, 115 S. W. 523.]

''Not only so, but we have said that it was the peculiar function of the trial courts to set aside verdicts as being against the weight of the evidence, and have a time or so admonished them as to this peculiar duty, and even criticised them for not promptly setting aside such verdict; i. e., against the weight of the evidence. (Cases cited.) This because the situation of a trial court was such as to better fit them for this duty, and further the law has imposed upon them such duty. (Cases cited.)

''We do not have, in this State, the 'scintilla doctrine,' but hold that a plaintiff must exhibit substantial evidence in support of his

case. The substance of the evidence is one question, but its credibility is another and different question. The appellate court, as a matter of law, passes upon the matter of substance and not the matter of credibility. In other words, an appellate court says that this particular evidence is substantial if the jury believes it to be true. So in this case we must say that the personal evidence of the plaintiff is substantial, if the triers of the facts believed it to be true, in the face of all the other evidence.''

If we should assume to say that the testimony of Hayden Scrivner or of Rosier Scrivner or of Wilford Scrivner, or of all of them is unworthy of belief and therefore to be stricken from the case for the purposes of ruling the demurrer, we would make the court the ultimate and real jury passing upon the facts. ''The right of trial by jury, as heretofore enjoyed, shall remain inviolate.'' [Art. 2, Sec. 28, Const. of Mo.] The Constitution of the United States, as originally proposed and adopted, not only did not contain any provision for trial by jury in civil actions, but it provided that in actions both in law and equity to which the federal judicial power should extend, the Supreme Court of the United States ''shall have appellate jurisdiction both as to law and fact.'' [Sec. 2, Art. 3, Const. of U. S.] So great a controversy arose over this clause that soon after the Constitution was ratified, Amendment 7 was adopted. It provides that in suits at common law where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. Mr. Justice Story (2 Story's Commentaries on the Const. of the U. S. (4 Ed.) sec. 1763 et seq., p. 523 et seq.), says of this amendment:

''It is a most important and valuable amendment, and places upon the high ground of constitutional right the inestimable privilege of a trial by jury in civil cases, a privilege scarcely inferior to that in criminal cases, which is conceded by all to be essential to political and civil liberty.''

Story amplified these views by quoting from one of his own able opinions in the case of Parsons v. Bedford, 28 U. S. 433, where the question was whether the Supreme Court of the United States could entertain a motion for a new trial and re-examine the facts tried by a jury, that being the practice under the local law and there being an act of Congress authorizing the courts of the United States in Louisiana to adopt the local practice with certain limitations. The Supreme Court, in that case, decided in 1830, answered the question in the negative, and declared that: ''The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy.'' Even though Amendment Seven to the Federal Constitution is not applicable to actions in state courts, yet these are potent and apt words which cannot be silenced by defendants' com-

plaint about influence over jurors in the community where this case was tried.

In our view of the case Exhibit B was not admissible. But if it were, the testimony of Hayden Scrivner concerning it would be substantial since the trial jury believed it, however incredible it may seem. A scintilla of evidence in the cases cited by defendant and in other cases is but a spark, a gleam, mere conjectures, as distinguished from reasonable inferences. [Cluett v. Union Electric Light & Power Co., 220 S. W. 865; Peck v. Missouri Pacific Railway Co., 31 Mo. App. l. c. 123; Williams v. Kansas City Southern Railway Co., 257 Mo. 87, 165 S. W. 788.]

We will next examine the origin and the admissibility of plaintiff's Exhibit B and in that connection we will also consider the substance and the admissibility of the testimony of Miss Kaiser.

2. *The Lost Instrument*: Rosier L. Scrivner, nephew of plaintiff, John C. Scrivner, was engaged with his uncle in 1921 in the promotion of the Scrivner Fire Clay Products Company and the building of a plant at Gerald, a village in Franklin County, Missouri. Rosier Scrivner testified that plaintiff's Exhibit B was a copy of a contract between the plaintiff, John C. Scrivner and defendant, American Car and Foundry Company; that he, Rosier, typed the copy in January or February, 1921, while he and his uncle were boarding at the house of Mrs. Lillie Armstrong in Gerald. He made the copy in the presence and at the request of John C. Scrivner, and uncle and nephew together compared the copy when made with the original. Rosier Scrivner had been traveling about with his uncle, since July, 1920, prospecting for fire clay, and the witness testified that the uncle, John C. Scrivner, carried the original contract in a suit case. But after the copy was made, and the Scrivner Fire Clay Products Company had built an office at Gerald, a small safe was obtained and the original contract was placed in the safe. On July 4, 1921, Rosier testified, he and his uncle went to the office of the Clay Company and looked at the original contract in the safe. It was there. The next morning, July 5, they went to the office of the Clay Company in Gerald and found the office door open and the lock "jimmied." They went into the room where the safe was. "The door of the safe was open and the knob was knocked off." The Scrivners examined the contents of the safe. Everything was there except the original contract between the plaintiff and defendant. It was missing and the witness, Rosier Scrivner, did not see nor hear of the instrument again. Rosier further testified that he stayed at Gerald until 1924, and that, after the loss of the contract, the door of the safe was closed and opened from time to time by means of the broken knob, but it was not locked, and only papers of small importance were kept in the safe. Rosier Scrivner explained that he knew that Exhibit B was a correct copy

of the original contract because he typed Exhibit B in 1921, and that he and his uncle, the plaintiff, compared Exhibit B with the original and found it to be a true copy. He did not remember the contract word for word. Rosier Scrivner was not present at the time that the contract was made in Attorney Lemaster's office in Granite City, Illinois, September 28, 1911, about nine and one-half years before the copy was typed. It is obvious that whatever knowledge or information Rosier had that the instrument (of which he made a copy) was the original contract in question, he gained from the statements to him of the plaintiff, his uncle. The plaintiff, who was called for the first time as a witness in rebuttal, gave no testimony concerning the opened safe, the missing contract, or the making of a copy of it. Neither was he examined about the execution of the contract in September, 1911.

Otto Beer, a safe expert, testified on behalf of defendant, that in October, 1928, about three weeks before the trial, he went to the office of the Scrivner Fire Clay Products Company at Gerald, Missouri, met the plaintiff, John C. Scrivner, there, and examined the safe from which, Rosier Scrivner testified, the original contract was removed in July, 1921. Beer found the safe locked. The knob, with dial attached, had been broken off by a blow of a hammer or other blunt instrument. Beer, using a screw-driver, operated a spindle to which the dial had been attached, worked out the combination to the lock and opened the door of the safe. It was empty. The door of the safe was produced in court. Beer, by demonstrations with the door and explanations, testified that no burglar or other person could have opened the door of the safe by breaking off the combination, unless he could devise the combination as Beer had done, or unless, by violence, he had broken the spindle, forced certain metal sheets on the inside of the door, and thrown certain bolts and tumblers, none of which had been done. Ernst J. Weiss, also a safe expert, watched Beer's courtroom demonstrations with the door of the Scrivner safe, and confirmed Beer's testimony of the impotency of a broken combination dial as a means of gaining entrance to the safe. Sixteen witnesses residing in and near Gerald, Missouri, testified that the reputation of Rosier Scrivner for honesty and integrity was bad. Ten of these witnesses who had worked for the Scrivner Clay Products Company also testified that they had visited the office of the company at sundry times subsequent to July, 1921, and observed that the safe in question was always in normal condition. Its knob and dial had not been removed. Almost all of the character witnesses had bought stock in the Scrivner Company and had lost their investment. Two witnesses who had been respectively sheriff of Franklin County and town marshal of Gerald in 1921, testified that they had not re-

428

ceived any report of and had never heard of a burglary and safe robbery at the office of the Scrivner Company in that year.

After the witnesses, Edward Hayden Scrivner, Miss Kaiser and Rosier Scrivner had testified, counsel for plaintiff offered in evidence Exhibit B, "a copy of the original contract which has been identified by these witnesses." Defendant objected upon the ground that there had been no showing that the contract had been authorized or ratified by defendant, and that Exhibit B was "not properly proven to be an exact copy of the alleged original agreement." The objection was overruled.

Did the trial court rule rightly? Defendant contends that the trial court erred, first because a proper foundation for the admission of secondary evidence had not been laid. This objection will be ruled against defendant. The preliminary proof of the loss or destruction of the primary evidence namely, the original contract, did not involve the question in issue and is not to be regarded as evidence in the cause. It was addressed solely to the trial court and its sufficiency was a question for that court and not for the jury. ■ Moreover, the sufficiency of the evidence on the preliminary proof rested in the sound discretion of the trial court, whose determination will not be disturbed by an appellate court although it is reviewable and may be overruled when an abuse of discretion amounting to error of law appears. [22 C. J. 1052; Harper v. Wilson (Mo. App.), 191 S. W. 1024; Liles v. Liles, 183 Mo. 326, 81 S. W. 1101; Wells v. Pressy, 105 Mo. 164, 16 S. W. 670; Henry v. Diviney, 101 Mo. 378, 13 S. W. 1057; Christy v. Kavanagh, 45 Mo. 375; Macon v. Fidelity, etc., Co., 194 Mo. App. 677, 189 S. W. 645; Lohnes v. Baker, 156 Mo. App. 397, 137 S. W. 282.]

The trial court heard the story of the looted safe, and, by its action in admitting Exhibit B in evidence it registered its belief in the sufficiency of that story as preliminary proof. We cannot say that this was an abuse of discretion amounting to an error of law. Nor should we change our view in the light of the testimony of the safe experts that it was mechanically impossible for a burglar to open the safe merely by knocking off the knob and dial forming part of the combination. In the case of Doyle v. St. Louis Merchants' Bridge Terminal Railway Co. (Mo. Sup.), 31 S. W. (2d) 1010, l. c. 1012, this court said:

"We cannot say as a matter of law that plaintiff's history of the manner of the occurrence was untrue or impossible. We know from common knowledge that inexplicable happenings do occur. Unless we can say that the evidence was opposed to the immutable laws of physics, we cannot declare it to be fiction. We cannot say that the evidence lacked weight or credence. The courts are reluctant to say that declared facts are manifestly impossible or untrue. [Schupback

v. Meshevsky (Mo. Sup.), 300 S. W. 465; Laudwig v. Power & Light Co. (Mo. Sup.), 24 S. W. (2d) 625, 1. c. 626.]''

Between July 5, 1921, when Rosier Scrivner found the safe open and the knob and dial broken, as he testified, and October, 1928, when the safe expert found the safe closed, there was too much time and opportunity for the intervention in the life of the safe of undisclosed uses and forces to warrant any declaration that the testimony of Rosier Scrivner in the light of the experts' demonstrations is manifestly impossible or untrue however incredible or improbable it might appear.

Defendant contends next that there was not any proper evidence that Exhibit B was a true or exact copy of the original contract, and that anything less than such evidence is inadmissible. Plaintiff contends that the law does not require proof of the entire contents of a lost contract but is satisfied with proof of its essential terms. He also urges that in this case there was substantial evidence that the copy of the contract which was put in evidence was a true copy of the lost original. Many authorities are cited in support of these contrary views. ''Secondary evidence of the contents of a writing may be furnished by the testimony of witnesses or by the production of a copy. On the question whether there are degrees of secondary evidence, that is, whether one kind of secondary evidence is admissible when another kind having more probative value is accessible, there are many *dicta* and some decisions, but these are in conflict. Some authorities hold that the most satisfactory kind of secondary evidence must always be produced or its absence explained, and according to this rule a copy, proved to be correct, is evidence of a higher grade than parol evidence of the contents of an instrument. Other authorities hold that there are no degrees of secondary evidence, but that parol or any other secondary evidence is competent which is admissible by other rules of law, its weight being a matter for the jury. ■ It is universally conceded, however, that where a proper case is made for the introduction of secondary evidence any kind of secondary evidence is competent which is admissible by other rules of law, unless it is shown by the nature of this evidence itself or is made to appear by the objecting party that other and more satisfactory secondary evidence is known to the other party and can be produced by him.'' [22 C. J. 1068.]

■ The weight of authority supports the rule of degrees of secondary evidence and this rule is favored in Missouri. [Aurora Bank v. Linzee, 166 Mo. 496, 65 S. W. 735; Zimmerman v. T. C. Bottom Produce Co. (Mo. App.), 192 S. W. 1038; Philipson v. Bates' Executor, 2 Mo. 77; Bosse v. Weik, 144 Mo. App. 468, 129 S. W. 417.] We need hardly cite authority for the statment that hearsay is not admissible as secondary evidence even as it is not admissible as primary evidence. [Cazier v. Hinchey, 143 Mo. 203, 44 S. W. 1052.]

■ Concerning a mode of proof as to the correctness of a copy, the rule is thus stated in 22 Corpus Juris, 1066: ''Where the secondary evidence offered is a writing purporting to be a copy of an original document, it must be shown that the writing is in fact a true copy. The usual mode of proving the correctness of a copy of a document which is lost, destroyed, or for some other reason cannot be produced at the trial, is by the testimony of a person who has compared the copy with the original and found it to be correct. In such case it is not necessary that the witness should have actually read the original, but it is sufficient that the original was read to him by another person while he read the copy and found that it corresponded with what was read to him.''

Examination of a large number of authorities, cited in support of the foregoing propositions discloses that in every case the witness who would testify concerning the correctness of the copy was capable of giving competent testimony of the genuineness and of the fact of the original instrument, if the same had not been lost but was forthcoming. For how else could such a witness give testimony tending to show that the writing is in fact a true copy?

■ Whatever knowledge or information that Rosier Scrivner had of the genuine character of the instrument of which he made a copy, or of the fact that this instrument was a written agreement between plaintiff and defendant was but hearsay, gained from his uncle the plaintiff. This information was without benefit of any exception to the general rule of the exclusion of hearsay. Rosier was not present at the time that the original contract was drafted, read and executed in the office of Mr. Lemaster on September 28, 1911. He was not the stenographer who typed it, nor was he a lawyer for either of the parties who negotiated it. If Rosier Scrivner had been handed an instrument purported to be the original contract and if he had identified it as such because his uncle the plaintiff had told him so, clearly his testimony would be inadmissible as hearsay. It would be absurd to say that nevertheless, in case of loss of the original, vouched as such to him by his uncle, he might competently identify a copy which he had made. The trial judge has a large discretion in determining whether secondary evidence may be given, but such evidence when allowed to go in must conform to the rules of evidence as well as must primary evidence. Plaintiff seems to sense this weakness in Rosier's testimony. He argues that if Rosier made an exact copy of a document which he had for several years seen in the possession of the plaintiff, then the copy, in conjunction with the oral evidence of the execution and contents of the contract given by Hayden and Miss Kaiser proves the identity of the paper copied as the contract executed September 26, 1911. It could reasonably be none other, he insists.

■ To this it may be answered that whatever value or authenticity

as evidence Exhibit B had when Hayden Scrivner and Miss Kaiser identified it, was derived from the testimony of Rosier Scrivner. Surely Hayden Scrivner and Miss Kaiser could not have been permitted to identify a purported copy of the contract, not authenticated or explained in any manner by proper evidence, as a copy of the original. If the testimony of Rosier Scrivner as to the copy is inadmissible, then Exhibit B passed into the hands of Hayden Scrivner and Miss Kaiser on the witness stand as a writing without the color of antecedent authority or a trace of authenticity. Exhibit B being thus and then unvouched for, the testimony of Hayden Scrivner and Miss Kaiser concerning it was inadmissible. The weakness of the testimony of Rosier Scrivner concerning the copy cannot be cured by that of the two other witnesses. Their testimony is not proper evidence unless Rosier's is admissible. To rule otherwise would be to invite the perils visioned in the case of Sharp v. Missouri Pacific Railway Company, 111 S. W. 1154, 213 Mo. 517. There this court ruled against the admissibility of a general book in which was kept a summary of the tally books of car inspectors. The court in its opinion said, 213 Mo. 536 :·

"In this condition of things it would be dangerously loose practice to permit the introduction of such secondary evidence. We are cited to no well-considered case holding such book admissible on such proof. We take it, its admission would be a novelty in the law, and if we were to allow its exclusion as error we would open the door to grave abuses by such a precedent."

This comment is especially pertinent where the lost instrument is the foundation of the action and more strictness in proof is required than in cases where the writing is only collaterally involved. If Hayden Scrivner or Miss Kaiser who witnessed the execution of the original contract had made a copy from the original and had identified it in court, the objection of defendant that Exhibit B had not been properly proven as a copy would not lie. Let it be added that if Exhibit B had not been brought into the case and if there was no evidence of the existence of Exhibit B within reach of the process of the court, Hayden Scrivner and Miss Kaiser would have been competent to give parol testimony of the substantive terms of the contract. But Exhibit B was produced, and it must stand or fall by the rules of evidence applicable to it. Cases holding that proof sufficient in law of the contents of the lost contract does not require proof of its entire contents, but the law is satisfied with proof of its essential terms are beside the question of evidence here presented. Exhibit B, having been produced, parol evidence of its essential terms was not admissible. The objection of defendant to plaintiff's Exhibit B should have been sustained. The action of the court in overruling the objection was prejudicial error.

3. *Ratification*: (a) Did defendant ratify the contract in suit? Or more precisely, was ratification of the contract, as made by Robert L. Fogelman on behalf of defendant properly a question for the jury on the facts in evidence? Fogelman, at the time of the contract on September 28, 1911, was superintendent of defendant's car building plant at the village of Madison, in Madison County, Illinois. He was in charge of operations there. He was also called district manager, but his authority did not go beyond the bounds of the Madison plant. Plaintiff does not assert that Fogelman was general manager—as he was styled in the contract—in the sense that he had authority over all of the seventeen plants of defendant situated in ten states. Across the Mississippi River from Madison, in St. Louis, defendant had executive offices in charge of a vice-president. Mr. Eaton, the president in 1911, had his headquarters in New York, and Mr. Edward F. Carry, then the general manager, now president of the Pullman Company, was stationed in Chicago. Fogelman did not have authority to execute the contract on behalf of defendant. ██ Knowledge by the principal of the unauthorized act done or agreement made by the agent is essential to ratification of such act or agreement. The question or fact of this essential knowledge is comparatively easy of solution when both principal and agent are natural persons. It is filled with perplexities when the principal is a corporation devoid of the senses by means of which knowledge comes to natural persons, but yet functioning far beyond the capacity of any individual by means of many agents and servants, with varying degrees of authority. Before considering the fact of knowledge in this case and the applicable law we may read with interest this historical comment on an epochal case in the growth of commercial corporations in this country, decided by the Supreme Court of the United States in 1827 (The Supreme Court in United States History by Charles Warren, Vol. II, page 156, et seq.):

"The third important case of the (January) 1827 Term, Bank of the United States v. Dandridge, 12 Wheat. 64, involved a vital question of corporation law—whether approval of acts of its agents by a corporation may be shown by presumptive testimony or only written record and vote. Though Marshall had held on Circuit that such record and vote were necessary, an affirmance of this view by the Court would have retarded the commercial development of this country immeasurably, for it is to be noted that it was just at this time that American business corporations were beginning to 'increase in a rapid manner and to a most astonishing extent,' (as Kent then wrote) . . . In this Dandridge case, Webster and Wirt argued for the Bank of the United States against L. W. Tazewell. . . . The opinion of the court, delivered by Judge STORY on February 28, (1827) upheld Webster's cause and overruled the Chief Justice, the latter dissenting but also admitting that the court's decision might

be 'perhaps to the advancement of public convenience.' While a few lawyers feared lest the decision might increase the power of corporations and might 'enable a vast engine of fictitious wealth to crush communities,' the principle laid down by the court was welcomed by the business world.''

Before the decision was rendered only banks and insurance companies, whose transactions then, as now, were mostly matters of record in the minutes of boards of directors, could live a prosperous corporate life. In the century that has passed, the new freedom of commercial and industrial corporations by means of agents and servants has been found to have its moments of embarrassment.

(b) It is elementary that the knowledge of the particular alleged agent himself of his unauthorized act cannot thus be imputed to the principal in such manner as to satisfy the requirement of knowledge by the principal. For, as to the matter in question, the person acting is not an agent until ratification, and it cannot be said that the principal has ratified with knowledge at the time of ratification simply because the person who thus becomes agent has knowledge. [1 Mechem on Agency (2 Ed.) sec. 407.] Only knowledge of the unauthorized contract, brought home to the corporate board, or officer or agent who had power to make the contract in question can be said to be that knowledge which begets either ratification or repudiation.

Edward F. Carry was not only general manager of defendant. He was also its first vice-president in September, 1911, when the contract in question was signed. He was a member of the board of directors and of the executive committee. As general manager he had jurisdiction of all the plants of defendant. He appointed Fogelman superintendent at Madison and he frequently visited that plant, because "it was a sore spot." Carry, in 1907, established under his management an improvement department, and placed at the head of it Joe Ames (now dead). But Mr. Frank Thompson, an assistant general manager under Mr. Carry, had charge of the department. Its purpose was to increase plant efficiency. There were several assistant general managers, but Mr. Thompson was the only one who had jurisdiction over all plants under Mr. Carry. He is the same Thompson, dead at the time of trial, who is said to have attended the first conference on the subject of a proposed contract with Scrivner, in the office of attorney Lemaster in Granite City on September 26, 1911. Mr. Carry, by his own testimony and by that of men holding the highest offices in the defendant corporation at the time of the trial, had authority in September, 1911, to make a contract of the nature of the one in suit, even though Mr. Carry testified that he would have consulted Mr. Eaton, the president, about any proposed contract involving a liability of $200,000. As a type of the testimony of witnesses for defendant touching Mr. Carry's authority we may quote Herbert W. Wolff, vice-president of the American Car and

Foundry Company, at the time that he gave his deposition in 1928, but who was chief mechanical engineer located in St. Louis, in 1911. Testifying concerning Mr. Carry, Mr. Wolff said: "The general manager had the general supervision of checking up on, and getting improvements for, the operation of the company, and for securing the rights to use patent devices. That came particularly under the supervision of the general manager." Therefore, such knowledge of the contract as the law requires in this case, coming to Mr. Carry, would be the knowledge of defendant.

Wilford Scrivner, a nephew of plaintiff, was working for defendant in its plant at Madison, Illinois, in 1912. He was an electrician, and was known as a "trouble shooter." His duties took him to any place in the plant where there might be electrical trouble. He testified that he knew Mr. Carry, the general manager, from seeing him pass through the plant from time to time. One day in 1912, while he was working in the steel erecting department, Wilford testified he heard a conversation between Mr. Fogelman and Mr. Carry. His testimony on this point is: "On that occasion I was working on the tracks on the reamers, splicing cable heads. I had just got through splicing a cable and had raised up, and I heard Mr. Fogelman say to Mr. Carry, 'Those are the Scrivner patent furnaces we have under lease.' Mr. Carry asked him how they were working, if they was giving satisfaction, and he said they were fine. He said they were saving them in oil and in rivets. I heard him say that in that talk that Mr. Fogelman had with him."

Fogelman and Carry then walked down along the construction track and Wilford Scrivner returned to the electric room. The witness further testified that he observed the furnaces in operation, identifying them with drawings shown on one of plaintiff's exhibits. Mr. Fogelman and Mr. Carry were talking fairly loud, because the plant was noisy with the clatter of air hammers, but the witness declared that he was able to hear what the two officials said. Carry, in his deposition, testified that he did not know plaintiff, John C. Scrivner; that until shortly before his deposition was taken, he never heard of a contract between plaintiff and defendant giving defendant the right to use a furnace, patented by plaintiff; that neither Fogelman nor Scrivner ever discussed with him the desirability of such an agreement; that Frank Thompson, the assistant general manager, and in charge of the improvement department, had no authority to execute or to direct Fogelman to execute any contract for the expenditure of $200,000 without having authority directly from him, Carry, to do so; and that he, Carry, never directed Thompson to sign or to authorize Fogelman to sign "any contract for the payment of $200,000 for the use of the furnace patented by Scrivner." But Mr. Carry qualified his statement that he had never heard of the Scrivner

furnace until his deposition was to be taken by adding on direct examination by defendant: "So far as Fogelman and Scrivner were concerned I can say positively there was no discussion with me as to whether or not it was desirable for the company to enter into such an agreement. Thompson was my assistant and I am not prepared to say but what at sometime or other, among other things, he didn't bring up some furnace." And, on cross-examination, Mr. Carry, testifying about his close contact with Mr. Thompson said that they saw each other practically every day when they were in the same town.

That there were some dealings between Fogelman and Scrivner about the furnace is shown by the testimony of two witnesses who were not of the Scrivner family. Howard L. Brown, assistant district manager at the Madison plant, who was assistant to Fogelman in October, 1911, testifying on behalf of defendant, stated: "Shortly after I came back to the Madison plant in October, 1911, I heard a conversation between Robert L. Fogelman and John C. Scrivner, the plaintiff in this case, in regard to a furnace. That conversation occurred in October, 1911, in Fogelman's office. I was in the office when Fogelman and Scrivner entered. Fogelman was a rather brusque individual, and after some conversation with Mr. Scrivner, I heard him remark, 'Get the hell out of here. The thing is no G—d-d—n good.' The thing hangs in my mind because Mr. Fogelman and I differed considerably in our method of handling men, and I felt that to handle workmen in that manner was not diplomatic. In that conversation Scrivner mentioned the furnace as 'my furnace.' He wanted to demonstrate 'my furnace.'"

Burnham Drew, who was a templet maker in the Madison plant in 1911, and worked in a drafting room, testifying on behalf of plaintiff, stated: "In the latter part of 1911 or the early part of 1912, I heard Mr. Fogelman and Mr. Thompson talking about this specific contract on this furnace known as the Scrivner furnace, and it seems that Fogelman was pulling to have that furnace in his plant, and I heard Mr. Fogelman and Mr. Thompson talking about that over the table across from where I was working. The substance was that they would get up a contract on the Scrivner furnace for a certain period of time and they would get to use it in the plant for a certain sum of money."

Plaintiff makes much of this latter testimony and also of Mr. Carry's statements of his reliance upon Mr. Thompson in the mechanical and plant efficiency matters, and also of the testimony of certain officials of defendant, who seemed to place Mr. Thompson on a par with Mr. Carry, in their respect for Mr. Thompson's authority. But the testimony of none of these men or of any other witnesses contradicts the testimony of Mr. Carry that Mr. Thompson did not

have authority to execute or authorize the execution of the contract in question. Absent this authority in Thompson, his knowledge of the contract was not the knowledge of the defendant corporation. At this point we may dispose of the contention of plaintiff that it was the duty of Fogelman and Thompson to communicate to Carry as general manager whatever knowledge came to them of the contract, and the jury had the right to presume that such duty was discharged and that such communication was made. If such presumption could at any time be indulged it was put to flight by Carry's testimony.

(c) *Use of Furnace*: Many witnesses testified for plaintiff and defendant as to the kinds or makes of oil-burning, rivet-heating furnaces which defendant used in its car building plant at Madison, Illinois, between 1911 and 1923 when electric heating furnaces were installed. Evidence of the use of the Scrivner furnace in the Madison plant is a factor in the solution of the problem of the sufficiency of evidence of knowledge. Defendant, in its brief, admits:

"Plaintiff's evidence tended to show that just such furnaces as those described in plaintiff's patent and represented by the cut set forth in the application attached to the patent were used on a large scale by the defendant in its plant at Madison, Illinois, from September, 1911, to 1923, when such furnaces were removed and replaced by electric furnaces."

The number of these witnesses for plaintiff was thirteen. They were men who had been employed as car builders in the Madison plant of defendant. Some of them located on the floor of the furnace the splash rock against which the burning oil, mixed with air, struck and spread. But others described the splash rock as coming from the top. Those who described the blast rock as descending from the roof said that it was made of fire clay. Those of plaintiff's witnesses who were working for the company before and after September, 1911, stated that they observed a change in the type of furnaces about that time. Plaintiff's thirteen witnesses were fairly unanimous in stating that the drawings attached to plaintiff's Exhibit A (the letters patent) correctly represented the furnace in use at Madison after September, 1911. They estimated the number of these furnaces variously from twenty-five to forty. One witness testified that he had worked for defendant at Terre Haute, Indiana, as well as at Madison, Illinois, and that he had seen the Scrivner type of furnaces in both places. At least one witness testified that, before 1911, rivet-heating furnaces in use at Madison sometimes became honey-combed with chemical deposits about the burner and had to be set aside. Several of these witnesses knew plaintiff John C. Scrivner as a workman in the Madison plant. But one of plaintiff's witnesses, Burnham Drew, who had been a templet maker and draftsman in the Madison plant from 1905 to 1916, bluntly stated: "I don't believe any living man could pass

through the plant and look at a burning furnace and say it was a Scrivner or it was the other furnace, the Ferguson furnace, or any other kind of furnace of that type." A comment which, if true, is equally applicable to the negative testimony of defendant and the affirmative testimony of plaintiff about the use of Scrivner furnaces. On behalf of defendant Mr. Gibbs, its patent attorney testified technically about the Scrivner patent, pointing out that the distinctive feature of it was the removable baffle or bridge wall made of metal and descending from the top. But if the company had wanted to build furnaces just like the drawing in plaintiff's patent, using however, brick instead of metal as a removable baffle from the top he would have advised against so doing. Mr. Scheckenbach, a field engineer in the service of defendant, whose duty it was from 1909 to visit the plants of defendant and look after mechanical constructions and improvements testified that the so-called Scrivner furnace, without the removable metal baffle was a conventional type of furnace in general use long before the date of the letters patent in 1911. He also testified that the furnace, with the removable metal baffle, was impractical on account of the great heat which must be produced. He never saw in the Madison plant or any other plant of defendant furnaces like to the Scrivner furnace. Plaintiff in rebuttal produced a technical engineer who testified that a metal baffle was practicable. Foreman, superintendents, district managers, and retired employees to the number of eight or ten, testified on behalf of defendant that they never saw in the Madison plant of defendant from 1910 to the time of the introduction of the electric furnace in 1923, oil-burning, rivet-heating furnaces having a baffle from the top, and that there was no radical change in the style of furnaces used in 1911, 1912, and 1913 down to 1923.

Under the evidence thus summarized was plaintiff entitled to have submitted to the jury the question whether defendant ratified the unauthorized contract of Fogelman? Although the parties take divergent views, they agree that there can be no ratification by a principal of an unauthorized contract of an agent unless the principal has knowledge of the terms and material facts of the contract. This is the settled law in Missouri and in all other jurisdictions. [Ham & Ham Lead & Zinc Investment Co. v. Catherine Lead Co., 251 Mo. 721, 158 S. W. 369; Common Sense Mining Co. v. Taylor, 247 Mo. 1, 152 S. W. 5; Lingenfelder v. Leschen, 134 Mo. 55, 34 S. W. 1089; Fleming v. Anderson (Mo. Sup.), 232 S. W. 718; St. Louis Gunning Advertising Co. v. Wanamaker & Brown, 115 Mo. App. 270, 90 S. W. 737.] But an examination of the copious citations in the briefs and of many other cases presents a seeming confusion and conflict of authority in the application of the principle to the facts of this case.

This arises for the most part from the differences of the states of facts. For instance, the two cases of Grafeman Dairy Co. v. Bank, 290 Mo. 311, 235 S. W. 435, and 315 Mo. 849, 288 S. W. 359, show that the rules of estoppel and ratification are not readily indulged in the case of the sale or encumbrance of real estate, especially if it is the plant of a going concern and the company did not derive any benefit from the proceeds of a mortgage loan, which went to pay the private personal debts of the president of the company who negotiated and executed the loan. The courts are slow to ascribe ratification to contracts made on behalf of banks whose officers are hedged about by laws and by the duty, more stringent than in the case of commercial or trading companies, of acting only under authority of the board of directors. Thus Winsor v. Lafayette Co. Bank, 18 Mo. App. 665, was a suit for commission for the sale of real estate under a contract of employment by the cashier of defendant bank. The court held that the sale of real estate was not part of the ordinary business of a bank and the making of agency contracts was not within the scope of the duties of the cashier. Altho the president and vice-president signed the deed, the court held that plaintiffs failed to show a ratification. Again, a non-trading corporation having no knowledge of the acts of its vice-president and general manager whose actual authority consisted in making collections could not be held on the theory of ratification of promissory notes signed by him in its name, he keeping for his own uses the money borrowed. [Sedalia National Bank v. Economy Steam Heating & Electric Co., 145 Mo. App. 319, 130 S. W. 377.] The greatest extremity of view of non-ratification, in the cases cited by defendant, is found in Bassick v. Aetna Explosive Co., 246 Fed. 974. Brokers for the sale of explosives, taking advantage of war conditions, contracted with the president of defendant to retain as commissions all money received over certain fixed prices. On account of a rapidly rising market and the large sums received by the brokers, it was held that the president had no authority to make such a contract, and that, even if it had been ratified and approved by the Board of Directors, the contract could not be upheld since the profits were so great that they amounted to a gift of the assets of the company. Here there could have been no ratification except by the stockholders of defendant.

On the other hand some cases cited by plaintiff, involving title to real estate, raise questions of notice and what facts and circumstances put a person of ordinary caution on inquiry. [Cooper v. Newell, 263 Mo. 190, 172 S. W. 326; Van Raalte v. Harrington, 101 Mo. 602, 14 S. W. 710.] Again a trustful widow, relying upon friends, neighbors and creditors of her late husband, foregoes opportunities to sell the equity in her husband's farm, and abides a purchase by a creditors' committee at a foreclosure sale and a resale,

with some ultimate benefit to her. [Madison v. Williams (Mo. App.), 16 S. W. (2d) 626.] ██ Small circumstances were held in this equity case to support ratification. Thus we have to fall back upon the rule that the probative force of facts and circumstances must depend in great measure on the peculiarities of each case.

██ It is settled law that the fact of knowledge may be found like any other fact, either from direct evidence or from the existence of other facts and circumstances from which the fact of actual knowledge properly may be inferred as in other cases. [1 Mechem on Agency (2 Ed.) sec. 406; 8 Encyclopedia of Evidence, sec. 3, p. 18; Smith v. Jefferson Bank, 120 Mo. App. 527, 97 S. W. 247; Campbell v. Pope, 96 Mo. 468, 10 S. W. 187; Rine v. Chicago & Alton Railway Company, 100 Mo. 228, 12 S. W. 641; Maupin v. Emmons, 47 Mo. 304; Vaughn v. Tracy (2 cases), 22 Mo. 417, 25 Mo. 318.] ██ It is also the rule that where the unauthorized act of an agent of a corporation is plainly for the benefit of the corporation an inference of ratification will arise from slight circumstances. [3 Thompson on Corporations, (3 Ed.) sec. 2169, p. 808, and cases cited; D'anglade & Robinson Mining Company v. Mexico-Joplin Land Company (Mo. App.), 190 S. W. 35.] In view of the conflict of testimony as to the identity of the furnaces used in defendant's plant at Madison, it can hardly be said that the beneficial use of plaintiff's patent was as plain as in many cases cited in support of this proposition. But the verdict would indicate either that the jury regarded the benefits as plain or that they took the presence in the Madison plant of furnaces identified by witnesses as Scrivner furnaces to be inconsistent with any other supposition than that of ratification. And this inconsistency of acts and conduct is held to be one way of showing ratification. [3 Thompson on Corporations (3 Ed.) sec. 2168, p. 806.]

██ The law in regard to the ratification of the acts of corporate officers and agents is almost wholly an application of the rules governing agents in general without regard to whether the principal is a corporation or a firm or an individual. So it is with the law as to the effect of notice to or knowledge of a corporate officer or agent, as imputable to the corporation. [4 Fletcher's Cyclopedia of the Law of Private Corporations, sec. 2212, p. 3429.] The author seeks to modify this principle with the statement that "it has been said that 'there are peculiar and urgent reasons for a more stringent enforcement of the rule against corporations than against individual principals, from the fact that the only way of communicating actual notice to a corporation is through its agents.'" But this assertion of stringency is harsh and clearly arises out of the circumstances of the cases quoted (Orme v. Baker, 74 Ohio St. 337) where a receiver of an insolvent bank denied responsibility of the institution for the wrongful acts of its defaulting and absconding cashier and vice-president. The true

rule is as stated without modification. It thus appearing that corporations and individuals are on a parity in the application of the rules governing agents, let us suppose that in the instant case, Mr. Carry owned privately and personally managed the business of the American Car and Foundry Company, and was himself the defendant here. In that case, should we hold that under the evidence touching knowledge and use, as here summarized, it was a submissible question whether Mr. Carry as principal had ratified the unauthorized contract of his agent Fogelman? It is our opinion that if Mr. Carry were Fogelman's principal and if he also were the defendant in this case, and if the testimony touching knowledge, use and acquiescence were the same as here, it would be as against Mr. Carry a submissible question whether he had ratified the unauthorized contract alleged to have been made by his agent Fogelman. And since we hold that Mr. Carry, the vice-president and general manager of defendant, American Car & Foundry Company, had authority to make on behalf of defendant the contract which Fogelman could not make, we rule, under the evidence in this case, that it was a submissible question whether defendant ratified the contract in suit.

4. *Assignment of Contract*: Defendant put in evidence a certified copy of the articles of association of Scrivner Fire Clay Products Company, a corporation heretofore mentioned. These articles were executed September 22, 1920. They recited that the capital stock of the company was $300,000 and that the same was fully paid by an assignment of the letters patent granted to plaintiff for an improvement in furnaces. The stated date and number of the letters patent identify them with the letters which are the basis of this suit. Plaintiff, as one of the seven incorporators, signed and swore to the articles, which also stated that plaintiff subscribed for 29,940 of the 30,000 shares of the company. Plaintiff offered in evidence minutes of a directors' meeting of the Clay Products Company held October 14, 1924, authorizing the transfer by the company to plaintiff, John C. Scrivner, for a consideration of one dollar, of all right, title and interest of the Clay Products Company in the letters patent. Plaintiff also put in evidence a written assignment dated October 14, 1924, by the company to him of its interest in the letters patent. It thus appears that from September 22, 1920, to October 14, 1924, the Scrivner Fire Clay Products Company owned the letters patent here involved. The consideration of $200,000 named in the contract in suit became due between these dates, namely on September 28, 1924. Defendant contends that all rentals accruing under a patent after the date of its transfer belong to the assignee and not to the assignor of the letters patent; that the consideration of $200,000 accrued on September 28, 1924, while the patent was owned by the Clay Products Company as assignee, and therefore that the company and not the plaintiff had

the right to sue under the contract, notwithstanding the subsequent assignment back by the company to plaintiff. ▮▮▮ Defendant cites authorities in support of the proposition, but it is unnecessary to rule on it. A defendant may demur to a petition when it appears upon the face thereof that the plaintiff has not legal capacity to sue or that there is a defect of parties plaintiff or defendant. [Section 770, Revised Statutes 1929.] And if these or any of the other matters enumerated in Section 770, do not appear upon the face of the petition the objection may be taken by answer. ▮▮▮ And if no such objection shall be taken either by demurrer or by answer, the defendant will be deemed to have waived the same. [Sec. 774, R. S. 1929.] The petition was not demurrable upon the grounds stated and therefore defendant should have set up in its answer that plaintiff assigned the patent and that the assignee held title at the time of the accrual of the consideration for the contract in suit. Defendant did not plead this defense in its answer and therefore it has waived it. [Butler v. Lawson, 72 Mo. 227; Bulkley v. Big Muddy Iron Co., 77 Mo. 105; Gregory v. McCormick, 120 Mo. 657, 25 S. W. 565; Ashton v. Penfield, 233 Mo. 391, 135 S. W. 938; New England Loan & Trust Co. v. Brown, 59 Mo. App. 461; Arnold v. Security Bank of St. Joseph, 285 S. W. 161; Baker v. Mardis, 1 S. W. (2d) 223.] Let it be added that the evidence does not disclose how the patent was assigned, whether in writing or otherwise, by plaintiff to the first board of directors of the Clay Products Company. A patent right is a creature of the Federal law and may be transferred only as authorized by that law. [Jewett v. Atwood Suspender Co., 100 Fed 647.] And the Federal Statute provides that every patent or any interest therein shall be assignable in law by an instrument in writing. [Sec. 4898, U. S. R. S.] Therefore, the waiver of the defense aside, there is not enough in the record to show a valid assignment of the patent to the corporation. This ground for the demurrer is ruled against defendant.

▮▮▮ 5. Defendant attacks five instructions which the court gave to the jury on behalf of the plaintiff. The attack is aimed not at their form but at their predication upon the hypothesis of evidence of plaintiff's Exhibit B and of ratification of the contract in suit by knowledge of its terms coming to Mr. Carry, vice-president and general manager of defendant, and by failure of defendant to repudiate the contract and to discontinue the use of the furnace promptly after Mr. Carry acquired this knowledge. In the view which we take of this case these instructions are erroneous and prejudicial in so far as they rest upon the hypothesis that "Plaintiff's Exhibit B (the copy of the contract in suit) in evidence before you is a true copy of said contract."

▮▮▮ 6. Defendant objects to the scope of plaintiff's cross-examination of Mrs. Mary Haun, wife of Henry Haun, a former employee of defendant in its Madison plant and to the testimony of plaintiff him-

self, given in the guise of rebuttal of Mrs. Haun. Many witnesses mentioned Haun in the course of the ten-day trial. Some rated him as Fogelman's first assistant and others assigned to him a position of less importance. Haun himself, in his deposition, testified that in 1911 he was first assistant to Fogelman in the Madison plant and in charge of the improvement department there. Defendant called Mrs. Haun, had her to testify that her husband had been in court during the early part of the trial under subpoena of plaintiff, but that at the last he became ill and was obliged to remain at home under a doctor's care. She also testified that plaintiff, John C. Scrivner, visited her husband several times some years before, and that, on one of these visits, she heard plaintiff say to Haun that Fogelman had given plaintiff a contract for a furnace, and that, if Haun would be a witness to that effect, plaintiff would give Haun $15,000, should plaintiff win the suit. On cross-examination of Mrs. Haun, counsel for plaintiff, for the purpose of refreshing his own memory, as he said, made use of a writing, purporting to have been signed by Haun, but which he did not read to the jury. With this writing in hand, counsel for plaintiff asked Mrs. Haun whether, in the conversation in which she mentioned the offer of $15,000, her husband did not say he would highly recommend the Scrivner furnace, that it was an improvement on any which the company had used, and that after Scrivner invented the furnace the defendant used it at the Madison plant to the exclusion of the old types. Mrs. Haun answered all the questions in the negative. Defendant contends that the cross-examination of Mrs. Haun should have been limited to that part of her direct testimony in which she ascribed to plaintiff the offer of $15,000 to her husband. The trial court overruled the objection, holding that, inasmuch as part of the conversation had been brought out, it was proper on cross-examination to have the witness detail all of it.

Plaintiff, John C. Scrivner, called in rebuttal, identified the signature of Henry Haun, to the instrument in writing which had been shown to Mrs. Haun and which counsel for plaintiff had used in cross-examination of Mrs. Haun. Plaintiff denied that he had offered Haun $15,000, and he testified that he visited Haun only once and that Mrs. Haun heard the conversation of the two men during that visit. Defendant objected to the plaintiff giving his version of the whole conversation with Haun, as not being in rebuttal of anything Haun had said, nor in impeachment of Haun, and as being inadmissible as evidence in the case. The court overruled the objection and permitted plaintiff to testify in rebuttal of Mrs. Haun. The examination of plaintiff then proceeded:

"Q. Go ahead, now, and give the jury the conversation. A. He said that the furnace they had gave perfect satisfaction, and they had had quite a number continuously in the shop from the time he went

there until he left, and that it was a great oil-saving device, that is, my furnace I had a patent on was a great oil-saving device, more than the old type of furnace, or the Ferguson furnace. I just don't remember all the conversation, all the conversation, that happened at that time.

"Q. When she was present only, now, the whole conversation that occurred when she was there. What was said by you and by him in her presence? A. What I said to him was that he had advised me to accept the terms and conditions of the contract. I asked him if he remembered that conversation in the beginning, just a few days before I entered into the contract with the American Car and Foundry Company. Then he said that he remembered that conversation, that he had advised me at that time to enter into the contract, because the Car Company had money, and they would use my patent just the same, and I asked him would he make a statement of that kind and he said he would make it in writing, and he would sign it.

"Q. That is the substance of the conversation? A. That is about the substance of the conversation."

It should be stated here that, after Mrs. Haun had testified in behalf of defendant, in its case in chief, defendant closed its case by reading the deposition of Henry Haun, taken on behalf of plaintiff. Haun, in his deposition, testified that, while he was head of the improvement department at the Madison plant under Fogelman, in 1911, one Scrivner furnace was built as an experiment, as a result of a conversation between Fogelman and Scrivner who wanted the furnace built and tried out. There was not more than one of these furnaces installed as far as he knew. Haun also testified that he never saw or heard of or had any knowledge of the contract sued upon. Haun in his deposition made no mention of any conversation between him and Scrivner at Haun's house, and he did not testify as had his wife to an offer of $15,000.

The question of admissibility raised by this assignment of error may be simplified by regarding the statements ascribed to Scrivner by Mrs. Haun as a course of conduct on the part of the plaintiff. If we assume that the offer of Scrivner to pay to Haun $15,000 amounted to an attempt to bribe a witness, this act of Scrivner, so far as this case is concerned, was at best an admission, circumstantial in its nature, that the plaintiff at the time of this offer was conscious of the weakness of his cause. [1 Wigmore on Evidence (2 Ed.) sec. 276, p. 565.] Testimony of this sort is admissible in civil actions within proper limits on the same principles that evidence of flight or resistance of arrest is admissible in a criminal case as tending to prove the guilt of the accused. On the general logical principle of explanation, the opponent to whom the incriminating conduct is ascribed may always introduce such facts as serve to explain away, on some other

hypothesis, the apparent significance of the fraudulent word or act. A consciousness of the weakness of the cause is the natural inference, but not the only possible one from such conduct. And there is nothing to prevent the admission of facts which make some other inference more plausible (1 Wigmore on Evidence (2 Ed.) sec. 281, p. 574), or, more importantly, of facts which dispute and contradict the imputed bad conduct and put to flight the inferences. It is quite impossible to draw definite and fixed lines between the admissible and inadmissible parts of conversations. Trial courts have large discretion, and appellate courts find difficulty in applying general rules to the ever changing facts of succeeding cases. If we regard alone plaintiff's version of his conversation with Haun, we note that plaintiff made self-serving statements and Haun made hearsay statements. Therefore the statements of both and thus the entire conversation as rehearsed by plaintiff should be excluded unless admissible under exceptions to the general rules. And in the search for these exceptions we find ourselves in a confusion of authority. But the question arises out of Mrs. Haun's testimony to the effect that Scrivner made a conditional offer to her husband of $15,000 to be a witness. And we should find a ready answer to the question of admissibility if we treat plaintiff's conduct as a circumstantial admission that he was conscious of the weakness of his case. Whatever testimony which he might give in rebuttal to explain or to deny his conduct should be admissible. And whatever testimony of plaintiff that goes beyond the bounds of explanation or of denial should be inadmissible. And the same standard should be applied to the cross-examination of Mrs. Haun. Judged by this rule, it is our opinion that the cross-examination of Mrs. Haun in the particulars complained of, plaintiff's version of the whole conversation with Haun as quoted, and the permitted use of a writing purporting to be signed by Haun, went beyond the bounds of explanation or denial of conduct and were prejudicial to defendant's substantial rights. Plaintiff makes the point that defendant did not lay a foundation in the trial court for the complaint made here. This may be true as to the cross-examination of Mrs. Haun but the objections to the testimony of plaintiff were ample and sufficient.

7. There remains one last matter to be noticed not for any question of law involved, but because defendant stresses it in his denunciation of the character of this litigation. The record shows that plaintiff filed three successive suits against defendant upon the same cause of action in the Circuit Court of the City of St. Louis. In each petition plaintiff alleged that he and defendant were citizens and residents of the State of New Jersey, which, if true, prevented removal of the case to the Federal court. Nevertheless, defendant had each of the causes removed to the Federal court on account of diversity of citi-

zenship. The Federal court overruled motions to remand in the first two suits, declaring it was "a plain case of constructive fraud," upon that court, since defendant moved to Camden, New Jersey, but two days before he filed the first suit. Plaintiff dismissed the first and second suit in the Federal court after the motion to remand was overruled. But the Federal court sustained the motion to remand the third suit as plaintiff by that time had been living in New Jersey a year and had worked and voted there. That third suit is the one before us for decision. Even though it be obvious that plaintiff moved to New Jersey in order to force a trial of his case in the courts of Missouri, the Federal court itself ultimately found that he was in fact a citizen and resident of New Jersey. And that question, as said, is not before us. As between the parties it appears that each was trying to choose a forum in which to try this case, the one in the courts of Missouri, the other in the Federal courts.

8. For the errors of the trial court in admitting Exhibit B in evidence over the objection of defendant, and in permitting Mrs. Haun to be cross-examined and plaintiff to testify concerning the conversation between plaintiff and Mr. Haun beyond the proper limits of explanation or denial of the charge that plaintiff had offered $15,000 to Mr. Haun, the judgment is reversed and the cause is remanded.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court en banc to the extent indicated by the following vote: *Ragland, J.*, and *Atwood, C. J.*, concur; *Gantt* and *Frank, JJ.*, concur in result; *White, Ellison* and *Henwood, JJ.*, concur in result and in all except the ruling that "Exhibit B" was inadmissible, in view of the objections made to the admission thereof.